**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF WISCONSIN**

IN RE: HARLEY-DAVIDSON AFTERMARKET PARTS MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION

**CASE NO. 2:23-MDL-3064-WCG**
**Electronically Filed**

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
## FOR FAILURE TO STATE A CLAIM

**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**
Thomas H. Burt
Lillian R. Grinnell
270 Madison Ave
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
burt@whafh.com
grinnell@whafh.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.     PLAINTIFFS' MAGNUSSON-MOSS CLAIMS ............................................. 4

    A.    Plaintiffs Plausibly Allege a Violation of the MMWA's Tying Rule ................... 4

    B.    Plaintiffs Have Alleged Harm ................................................................................ 9

    C.    The CAC Properly Alleges a Violation of the MMWA's Disclosure Rule .......... 11

    D.    Pre-Sale Warranty Obligations Do Not Help Harley .......................................... 12

    E.    The FTC Action Supports the Plausibility of the MMWA Allegations ............... 13

II.    PLAINTIFFS' ANTITRUST CLAIMS .......................................................... 15

    A.    Plaintiffs Have Alleged an Antitrust Tying Arrangement ................................... 16

    B.    Plaintiffs Have Plausibly Alleged Antitrust Markets .......................................... 24

        1.    The CAC Sufficiently Pleads a New Market for American-Made, Large, Roadgoing Motorcycles ..................... 25

        2.    The CAC Sufficiently Pleads a Compatible Parts Market ...................... 28

    C.    Plaintiffs Have Alleged Restraint of Trade ........................................................ 30

        1.    Market Power ........................................................................................... 31

        2.    Volume of Commerce ............................................................................. 32

        3.    Anticompetitive Effects ........................................................................... 34

    D.    Plaintiffs Have Adequately Alleged Market Power in the Tying Product Market ..................................................................................................................... 34

    E.    Plaintiffs Sufficiently Plead Antitrust Injury and Damages ............................... 38

    F.    Plaintiffs Appropriately Bring Claims under the Wisconsin Antitrust Act ......... 41

III.    PLAINTIFFS' CLAIMS THAT "SOUND IN FRAUD" ................................ 43

IV.    PLAINTIFFS' OTHER STATUTORY CLAIMS ........................................... 47

    A.    Michigan and Oklahoma Consumer Protection Statutes Do Not Exempt Harley's Conduct ............................................................................................................... 47

    B.    The Illinois Plaintiffs Received Fraudulent Communications from Harley Davidson ............................................................................................................... 48

    C.    Plaintiffs' Alleged Failure to Provided CLRA Notice Is Not a Basis for Dismissal ............................................................................................................... 49

    D.    Plaintiffs' California UCL (and Other Equitable Relief Claims) Are Cognizable 51

i

    E.     Defendant's Meritless Undeveloped Argument on Plaintiffs' Claims ................. 51

V.     PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ........................................................ 52

    A.     Harley's Bare Assertion that Unjust Enrichment Falls with
             Other Claims Is Incorrect ...................................................................... 52

    B.     Adequate Remedies at Law ..................................................................... 53

    C.     California Construes Unjust Enrichment as a Request for Restitution ................. 54

    D.     Plaintiffs Satisfy the Direct Benefit Element ......................................... 54

CONCLUSION ........................................................................................................ 55

# TABLE OF AUTHORITIES

CASES                                                                                                        Page(s)

*In re Apple & AT&T iPad Unlimited Data Plan Litig.,*
   802 F. Supp. 2d 1070 (N.D. Cal. 2011) ................................................................. 48

*In re Aqua Dots Prod. Liab. Litig.,*
   654 F.3d 748 (7th Cir. 2011) ............................................................................... 10

*Arreola v. Godinez,*
   546 F.3d 788 (7th Cir. 2008) ............................................................................... 41

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................... 3

*Astiana v. Hain Celestial Grp., Inc.,*
   783 F.3d 753 (9th Cir. 2015) ............................................................................... 52

*Aurora Health Care Inc. v. Blue Cross Blue Shield,*
   No. 22-cv-1159-bhl,
   2023 U.S. Dist. LEXIS 166122 (E.D. Wis. Sep. 19, 2023) ................................... 51

*Baird v. Samsung Electrs. Am., Inc.,*
   2018 WL 4191542 (N.D. Cal. Jul. 20, 2018),
   *rev'd and remanded on other grounds,*
   804 F. App'x 481 (9th Cir. 2020) ....................................................................... 49

*Bank of Montreal v. Avalon Capital Grp., Inc.,*
   743 F. Supp. 2d 1021 (D. Minn. 2010) ............................................................... 51

*Baranco v. Ford Motor Co.,*
   294 F. Supp. 3d 950 (N.D. Cal. 2018) ................................................................. 47

*Bellevue Ventures, Inc. v. Morang-Kelly Inv.,*
   302 Mich. App. 59,
   836 N.W.2d 898 (2013) ....................................................................................... 51

*Benipayo v. Volkswagen Grp. of Am., Inc.,*
   2020 WL 553884 (N.D. Cal. Feb. 4, 2020) .......................................................... 49

iii

*Billsie v. Brooksbank,*
    525 F. Supp. 2d 1290 (D.N.M. 2007) ................................................................. 51

*Blanchard & Assocs. v. Lupin Pharms., Inc.,*
    900 F.3d 917 (7th Cir. 2018) .............................................................................. 52

*In re Broiler Chicken Antitrust Litig.,*
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................................. 41

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ..................................................................................... 24, 27

*In Brumfield v. Merck & Co., Inc.,*
    2018 WL 2277835 (E.D.N.Y. May 18, 2018) ................................................... 44

*Burns v. Paddock,*
    503 F.2d 18 (7th Cir. 1974) ............................................................................... 10

*Cabrales v. Castle & Cooke Mortg., Ltd. Liab. Co.,*
    No. 1:14-cv-01138-MCE-JLT,
    2015 U.S. Dist. LEXIS 76636 (E.D. Cal. June 10, 2015) ................................... 52

*In re Cardizem CD Antitrust Litig.,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000) ............................................................ 53

*Camasta v. Jos. A. Bank Clothiers, Inc.,*
    761 F. 3d 732 (7th Cir. 2014) ............................................................................ 42

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
    467 U.S. 837 (1984) ........................................................................................... 13

*Chiulli v. Am. Honda Motor Co.,*
    No. 22-cv-06225-MMC,
    2023 WL 5763053 (N.D. Cal. Sept. 6, 2023) ................................................... 46

*Cisneros v. Lynch,*
    834 F.3d 857 (7th Cir. 2016) ............................................................................. 13

*Clark v. InComm Fin. Servs., Inc.,*
    2023 WL 5167364 (C.D. Cal. Jul. 17, 2023) .................................................... 49

iv

*Collins Inkjet Corp. v. Eastman Kodak Co.,*
   781 F.3d 264 (6th Cir. 2015) ..................................................................... 3, 17, 18

*Connick v. Suzuki Motor Co.,*
   174 Ill. 2d 482 (1996) .................................................................................... 47

*Cota v. Ralph Lauren Corp.,*
   603 F. Supp. 3d 666 (E.D. Wis. 2022)........................................................... 43

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
   362 F. Supp. 3d 510 (N.D. Ill. 2019) ........................................................ 29, 41

*In re Deere & Company Repair Service Antitrust Litig.,*
   MDL no. 3030 (N.D. Ill., November 27, 2023) ("Deere"), slip op. ................*passim*

*Dixon v. Nat'l Hot Rod Ass'n,*
   No. 119CV01470JRSDML,
   2021 WL 1175198 (S.D. Ind. Mar. 29, 2021)................................................. 25

*Dunbar v. Kohn Law Firm, S.C.,*
   896 F.3d 762 (7th Cir. 2018) ........................................................................... 6

*Duty Free World v. Mia. Perfume Junction, Inc.,*
   253 So. 3d 689 (Fla. 3d DCA 2018) .............................................................. 51

*DXS, Inc. v. Siemens Med. Sys.,*
   991 F. Supp. 859 (E.D. Mich. 1997).............................................................. 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451, 463 (1992)..................................................................... 17, 19, 26

*Erie R. Co. v. Tompkins,*
   304 U.S. 64 (1938).......................................................................................... 47

*Feeco Intern., Inc., v. Oxane Materials, LLC,*
   2013 WL 5273930 (E.D. Wisc. Sept. 18, 2013) ............................................ 49

*Fido's Fence, Inc. v. Canine Fence Co.,*
   672 F. Supp. 303 (E.D.N.Y. 2009) ........................................................... 20, 22

v

*First Priority Emergency Vehicles, Inc. v. REV Ambulance Group Orlando, Inc.,*
 No. 3:18-CV-9805-BRM-DEA,
 2020 WL 2029344 (D.N.J. Apr. 28, 2020) ............................................................... 26

*Fon Du Lac Bumper Exchange, Inc. V. Jui Li Enterprise Co. Ltd.,*
 85 F. Supp. 2d 1007 (E.D. Wis. 2015) ..................................................... 42, 43, 46

*Forgue v. City of Chicago,*
 873 F.3d 962 (7th Cir. 2017) .................................................................................. 4

*Freeman v. MAM US Corp.,*
 528 F. Supp. 3d 849 (N.D. Ill. 2021) .................................................................... 41

*In re Gen. Motors Corp.,*
 2005 WL 1924335 (W.D. Okla. Aug. 8, 2005) ..................................................... 46

*In re German Auto. Mfrs. Antitrust Litig.,*
 612. F. Supp. 3d 967 (N.D. Cal. 2020) ................................................................ 25

*Gibson v. City of Chicago,*
 910 F.2d 1510 (7th Cir. 1990) .............................................................................. 50

*Gibson v. Lynn Univ., Inc.,*
 504 F. Supp. 3d 1335 (S.D. Fla. 2020) ................................................................ 52

*GMC v. Gibson Chem & Oil Corp.,*
 786 F.2d 105 (2d Cir 1986) ............................................................................ 20, 22

*Golden Star Wholesale, Inc. v. ZB Importing, Inc.,*
 531 F. Supp. 3d 1231 (E.D. Mich. 2021) ............................................................. 46

*Gumwood HP ShBring Partners, L.P. v. Simon Prop. Grp., Inc.,*
 No. 3:11-CV-268 JD,
 2013 WL 3214983 (N.D. Ind. Mar. 13, 2013) ..................................................... 34

*HDC Med., Inc. v. Minntech Corp.,*
 411 F. Supp. 2d 1096 (D. Minn. 2006) ................................................................ 21

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,*

131 Ill. 2d 145, 545 N.E.2d 672,
137 Ill. Dec. 19 (Ill. 1989) ................................................................ 51

*Hypertherm, Inc. v. Am. Torch Tip Co.,*
No. 05–cv–373–JD,
2007 U.S. Dist. LEXIS 67579 (D.N.H. Sept. 11, 2007) ......................... 22

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
125 F.3d 1195 (9th Cir. 1997) .......................................................... 27

*Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters.,*
505 F. Supp. 3d 570 (M.D.N.C. 2020) ............................................... 51

*John v. Whole Foods Mkt. Grp., Inc.,*
858 F.3d 732, 736-38 (2d Cir. 2017) ................................................. 10

*Johnson v. Nationwide Indus., Inc.,*
No. 77 C 1162, 1985 WL 2003 (N.D. Ill. July 1, 1985),
*on reconsideration,* No. 77 C 1162, 1986 WL 7072 (N.D. Ill. June 16, 1986) ...................... 37

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,*
677 F.2d 1045, 1054 (5th Cir. 1982),
*cert. denied*, 459 U.S. 1105 (1983) .................................................... 37

*Kennedy v. Carriage Cemetery Servs.,*
727 F. Supp. 2d 925 (D. Nev. 2010) .................................................. 51

*Kiriacopoulos v. GM LLC,*
No. 22-10785,
2023 U.S. Dist. LEXIS 60001 (E.D. Mich. Apr. 5, 2023) ...................... 53

*Kypta v. McDonald's Corp.,*
671 F.2d 1282 (11th Cir. 1982) ........................................................ 39

*Lakeland Reg'l Med. Ctr., Inc. v. Astellus US, LLC,*
763 F.3d 1280 (11th Cir. 2014) ........................................................ 38

*Lass v. Bank of Am., N.A.,*
695 F.3d 129 (1st Cir. 2012)............................................................. 51

vii

*Le v. Kohls Dep't Stores, Inc.,*
160 F. Supp. 3d 1096 (E.D. Wis. 2016) .................................................................... 51

*Lerma v. Univision Communications, Inc.,*
52 F. Supp. 2d 1011 (1999) ........................................................................................ 15

*In re Linerboard Antitrust Litig.,*
223 F.R.D. 335 (E.D. Pa. 2004) ................................................................................. 14

*Malaro v. Wilkie,*
No. 22-10548-NMG,
2023 U.S. Dist. LEXIS 87863 (D. Mass. May 19, 2023) ........................................ 52

*Mann v. Vogel,*
707 F.3d 872, 877 (7th Cir. 2013) ............................................................................... 4

*Marolda v. Symantec Corp.,*
672 F. Supp. 2d 992 (N.D. Cal. Jul. 28, 2009) ......................................................... 44

*Marts v. Xerox,*
77 F.3d 1109 (8th Cir. 1996) ..................................................................................... 22

*Maryland Staffing Services, Inc. v. Manpower, Inc.,*
936 F. Supp. 1494, (E.D. Wi. 1996) ......................................................................... 39

*Mashallah, Inc. v. W. Bend Mut. Ins. Co.,*
20 F.4th 311 (7th Cir. 2021) ...................................................................................... 52

*McCauley v. City of Chicago,*
671 F.3d 611 (7th Cir. 2011) ....................................................................................... 4

*McDermott v. Marcus, Errico, Emmer & Brooks, P.C.,*
775 F.3d 109 (1st Cir. 2014) ...................................................................................... 15

*MCI Communications Corp. v. Amer. Tel. & Tel. Co.,*
708 F.2d 1081 (7th Cir. 1983) ............................................................................. 35, 36

*Meyers v. Bayer AG, Bayer Corp.,*
2007 WI 99, 303 Wis. 2d 295,
735 N.W.2d 448 (2007) .............................................................................................. 42

viii

*Morrison v. YTB Int'l, Inc.,*
    649 F.3d 533 (7th Cir. 2011) ........................................................................ 39, 41

*Mooney v. Allianz Life Ins. Co. of N. Am.,*
    244 F.R.D. 531 (D. Minn. 2007) ............................................................................ 40

*In re Musical Instruments & Equip. Antitrust Litig.,*
    798 F.3d 1186 (9th Cir. 2015) .............................................................................. 14

*Myun-Uk Choi v. Tower Research Capital LLC,*
    165 F. Supp. 3d 42 (S.D.N.Y. 2016) ...................................................................... 51

*N. Grp., Inc. v. Tech 4 Kids Inc.,*
    352 F. Supp. 3d 882 (E.D. Wis. 2018) ................................................................... 51

*Net2Globe Int'l, Inc., v. Time Warner Telecom of N.Y.,*
    273 F. Supp. 2d 436 (S.D.N.Y. 2003) .................................................................... 52

*Norman v. FCA US, LLC,*
    *2:22-CV-11393-TGB-CI,*
    2023 WL 6388926 (E.D. Mich. Sept. 30, 2023) ..................................................... 48

*Nuwer v. FCA US Ltd. Liab. Co.,*
    552 F. Supp. 3d 1344 (S.D. Fla. 2021) .................................................................. 53

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274, (2018) ......................................................................... 28, 29, 30

*Olstad v. Microsoft Corp.,*
    284 Wis. 2d 224, 700 N.W.2d 139 (2005) .............................................................. 41

*Oregon Potato Co. v. Kerry Inc.,*
    575 F. Supp. 3d 1064 (W.D. Wis. 2021) ................................................................ 40

*In re Packaged Seafood Antitrust Litig.,*
    332 F.R.D. 308 (S.D. Cal. 2019) ........................................................................... 40

*Packaging Supplies, Inc. v. Harley-Davidson, Inc.,*
    No. 08-CV-400,

ix

2009 WL 855798 (N.D. Ill. Mar. 30, 2009)............................................................. 31, 33, 37, 38

*Palmer v. Procter & Gamble Co.*,
2023 WL 5852252 (N.D. Ill. Sept. 11, 2023) ................................................................. 42, 45

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*,
826 F.2d 712 (7th Cir. 1987) ........................................................................................... 30

*PB Property Mgmt. Inc. v. Goodman Manufacturing Co. L.P.*,
2013 WL 12172912 (M.D. Fla. Aug. 28, 2013) ................................................................. 44

*Pension Tr. Fund for Operating Eng'rs v. Devry Educ. Grp.*,
2017 U.S. Dist. LEXIS 200272 (N.D. Ill. Dec. 6, 2017) .................................................... 14

*In Re Porsche Cars North America, Inc.*,
880 F. Supp. 2d 801 (S.D. Ohio July 19, 2012) ................................................................. 46

*Reger v. Ariz. RV Ctrs.*,
LLC, 515 F. Supp. 3d 915 (N.D. Ind. 2021) ......................................................................... 8

*Reichert v. Keefe Commissary Network, L.L.C.*,
331 F.R.D. 541 (W.D. Wash. 2019) .................................................................................... 51

*Reiff v. Bd. of Regents of the Univ. of Wisc. Sys.*,
2014 WL 4546041 (W.D. Wisc. Sept. 12, 2014) ................................................................. 50

*Reifert v. S. Cent. Wisconsin MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ........................................................................... 15, 31, 34, 37

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
381 F.3d 717 (7th Cir. 2004) ............................................................................................. 23

*RX Sys. v. Med. Tech. Sys.*,
1995 U.S. Dist. LEXIS 14214 (N.D. Ill. Sep. 29, 1995) ..................................................... 21

*In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*,
155 F. Supp. 3d 772 (N.D. Ill. 2016) .................................................................................... 7

*Sands v. Menard*,
2017 WI 110, 379 Wis. 2d 1,

x

904 N.W.2d 789 .................................................................................................... 51

*Schaer v. Newell Brands Inc.,*
   No. 3:22-CV-30004-MGM,
   2023 WL 2033765 (D. Mass. Feb. 16, 2023) .......................................................... 5

*Schor v. Abbott Labs.,*
   457 F.3d 608 (7th Cir. 2006) ................................................................................ 21

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC,*
   950 F.3d 911 (7th Cir. 2020) ................................................................................ 23

*Shea v. GM LLC,*
   567 F. Supp. 3d 1011 (N.D. Ind. 2021) ................................................................ 8

*Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.,*
   Civil Action No. 07-5295,
   2008 WL 3833577 (D.N.J. Aug. 13, 2008) ........................................................... 39

*Sheridan v. Marathon Petroleum Co. LLC,*
   530 F.3d 590 (7th Cir. 2008) .................................................................. 19, 20, 35

*Shu v. Toyota Motor Sales USA, Inc.,*
   2023 WL 3028071 (N.D. Cal. Apr. 19, 2023) ...................................................... 48

*Siegal v. GEICO Cas. Co.,*
   523 F. Supp. 3d 1032 (N.D. Ill. 2021) (Coleman, J.) .......................................... 9

*Simon v. Philip Morris Inc.,*
   124 F. Supp. 2d 46 (E.D.N.Y. 2000) ................................................................... 40

*Sisemore v. Dolgencorp, LLC,*
   212 F. Supp. 3d 1106 (N.D. Okla. 2016) ............................................................ 46

*SMS Sys. Maint. Servs. v. Dig. Equip. Corp.,*
   188 F.3d 11 (1st Cir. 1999) .................................................................................. 21

*Spectrum Sports, Inc. v. McQuillan,*
   506 U.S. 447 (1993) .............................................................................................. 35

*State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.,*
730 F. Supp. 826 (C.D. Ill. 1990) ................................................................................ 32

*Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.,*
522 F. Supp. 3d 402 (N.D. Ill. 2021) ...................................................................... 40, 41

*Tingley Sys., Inc. v. CSC Consulting, Inc.,*
152 F. Supp. 2d 95 (D. Mass. 2001) ............................................................................ 40

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001) ........................................................................................ 25

*United States v. E. I. du Pont de Nemours & Co.,*
351 U.S. 377 (1956) ("Cellophane") .......................................................................... 23

*United States v. Loew's, Inc.,*
371 U.S. 49 (1962) ...................................................................................................... 32

*United States v. Grinnell Corp.,*
384 U.S. 563 (1966) ................................................................................ 23, 28, 29, 36

*United States v. Phillipsburg National Bank and Trust Company,*
399 U.S. 350 (1970) .................................................................................................... 28

*United States ex rel. Roach Concrete, Inc. v. Veteran Pac., JV,*
787 F. Supp. 2d 851 (E.D. Wis. 2011) ........................................................................ 10

*Van Den Heuvel v. AI Credit Corp.,*
951 F. Supp. 2d 1064 (E.D. Wis. 2013) ...................................................................... 42

*Vasquez v. Ind. Univ. Health, Inc.,*
40 F.4th 582 (7th Cir. 2022) ................................................................................... 3, 26

*Viamedia, Inc. v. Comcast Corp.,*
951 F.3d 429 (7th Cir. 2020) ............................................................................ 3, 17, 33

*Vital Pharms., Inc. v. Berlin Packaging LLC,*
632 F. Supp. 3d 780 (N.D. Ill. 2022) .......................................................................... 30

*Walkowicz v. Am. Girl Brands, LLC,*

No. 20-cv-374-JDP,
2021 U.S. Dist. LEXIS 26319 (W.D. Wis. Feb. 11, 2021)..........................................6

*Weiss v. York Hosp.,*
745 F.2d 786, 826 (3d Cir. 1984).................................................................28

*Wells v. Johnson & Johnson,*
554 F. Supp. 3d 1207 (W.D. Okla. 2021) .........................................................51

*Will v. Comprehensive Acct. Corp.,*
776 F.2d 665 (7th Cir. 1985) ....................................................................38

*Williams v. Apple, Inc.,*
No. 19-CV-04700-LHK,
2020 WL 6743911 (N.D. Cal. Nov. 17, 2020) ....................................................49

*Williams v. State Farm Mut. Auto. Ins. Co.,*
No. 22 C 1422,
2023 WL 4106067 (N.D. Ill. June 21, 2023) ......................................................39

*Womick v. Kroger Co.,*
2022 WL 673095 (S.D. Ill. Mar. 7, 2022) .....................................................43, 45

*Young v. Verizon's Bell Atl. Cash Balance Plan,*
615 F.3d 808 (7th Cir. 2010) .....................................................................7

**STATUTES & RULES**
Cal. Civ. Code § 1782(a)(1)........................................................................48

Federal Rules of Civil Procedure
8(d)(2) ..........................................................................................51
9(b)...........................................................................................42, 43, 45
12(b)(6) ........................................................................................3, 40

16 C.F.R. § 700.10(a)...............................................................................5
§ 700.10(c) ...................................................................................5, 6, 9
§ 701.3(a)(2) ...................................................................................11
§ 702.3(a) .....................................................................................12
§ 702.3(b)......................................................................................12
§ 702.3(b)(2) ...................................................................................13
§ 702.3(b)(2)(i)-(iv) .............................................................................13

15 U.S.C. §§ 2301-2312 .......................................................................................... 4

  § 2302(a) ......................................................................................................... 9, 11

  § 2302(c) ............................................................................................................. 5

Magnuson-Moss Warranty Act ("MMWA").........................................................*passim*

Michigan Consumer Protection Act ("MCPA") ................................................. 46, 47

Oklahoma Consumer Protection Act ("OCPA") ............................................... 46, 47

Restatement (Second) of Contracts § 203(a) (1981)................................................ 8

## **OTHER AUTHORITIES**

Black's Law Dictionary 979 (6th edition ed. 1990) ................................................. 6

Case 2:23-md-03064-WCG   Filed 12/14/23   Page 15 of 72   Document 50

## INTRODUCTION

Plaintiffs Jacqueline and Robert Assise, Edward Heymer, Vladimir Lipkin, Anzhela Demkiv, Scott Koller, Rita Weaver, James Billings, Curtis Perry, Vincent Romeo, Debra Plinck, Thomas Navarette, Gary Chelenyak, Richard Hawkins, Aaron Harris submit this Memorandum of Law in opposition to Harley-Davidson's (hereinafter "Harley") Motion to Dismiss for Failure to State a Claim.

Harley is the largest American maker of motorcycles. It sells each of its new motorcycles with a warranty; one cannot be bought without the other. Harley is also a maker of parts for its motorcycles, not only for repair, but for performance upgrades and personalization. This parts business is lucrative, accounting for approximately 15% of Harley's revenue. Consolidated Amended Complaint ("CAC" or "Complaint") ¶ 4. To maximize its market share in the lucrative parts market, Harley threatened to void its new bike warranty if its customers installed any of its competitors' parts. The purpose and effect of this threat was to get new bike purchasers to buy only Harley-Davidson parts. These warranty restrictions were not explained, let alone tailored, in any meaningful way to performance or reliability concerns, leaving the riders exposed to at-will revocation while riding motorcycles that cost five figures.

The CAC alleges that this violates both warranty and antitrust laws. Specifically, Plaintiffs assert a two-part claim for violation of the federal Magnusson-Moss Warranty Act, one under a provision of the act that prohibits tying the warranty to the use of a specific brand's parts, and the other under a provision that bars incomplete disclosure, because instead of telling the riders under what circumstances it would declare the warranty void, it told them to see a dealer, maximizing the uncertainty of its cancelation threat. Plaintiffs also bring claims under the state warranty statutes of all fifty states on the same two theories.

Plaintiffs also assert a claim that Harley's conduct constituted an unlawful tie under state antitrust laws. Because the riders purchased their bikes through dealers instead of directly from Harley, they assert their indirect antitrust claims under the state law of Wisconsin, or in the alternative each of those states that permit indirect-purchaser antitrust claims.

Harley's attempts to defend its warranty restrictions are weak, leading with the mistaken assertion that the restrictions are somehow permissible because Harley merely threatened that it "may" revoke the warranty. The Federal Trade Commission ("FTC") indisputably has the authority to regulate warranties and interpret its own regulations, and the FTC brought its own action against Harley to challenge Harley's practice, which was a straightforward violation of the agency's regulations. Harley settled that action by agreeing, pre-filing, to cure the alleged misconduct. Nevertheless, Harley urges the Court to read the FTC action as though it never happened because Harley agreed to cease its unlawful conduct without admitting any wrongdoing. But Plaintiffs do not seek summary judgment based on preclusion (which would be available only if Harley had admitted a violation). Instead, at this stage, Plaintiffs only need to have alleged a plausible case.

Harley also attacks the warranty claims on the basis that each rider must show a coverage denial. That is not the rule, and Harley cites no authority to the contrary. Here, the Complaint pleads that each rider overpays because of Harley's conduct.

Harley similarly misfires in its attacks on Plaintiffs' antitrust claims, which are based on a tying theory. The bike and warranty bundle (sold together as a single product) is the tying product, and motorcycle parts are the tied product. Here, Harley has monopoly power in the tying market, and it used its monopoly power in the tying motorcycle market to suppress the competitive fringe and extract higher prices in the tied parts market. Harley's attacks on the definitions of these

2

markets run afoul of the Seventh Circuit's clear message to district courts not to substitute judgment calls for factual allegations in matters of market definition at the pleading stage. *See*, *e.g.*, *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 587 (7th Cir. 2022), *infra* at 23.

In *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 471 (7th Cir. 2020), the Seventh Circuit adopted the Sixth Circuit's *Collins Inkjet* rule, *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015). It is unlawful tying to adopt policies that make it unreasonably difficult or expensive to buy the tying product (here, the bike) without the tied product (the parts). *In re Deere & Company Repair Service Antitrust Litig.*, MDL no. 3030 (N.D. Ill., November 27, 2023) ("*Deere*"), slip op. (tying properly pleaded where tractor maker used market power to force owners to use authorized repair services). A rider that bought a competitor's replacement part, performance upgrade, or even a cosmetic personalization ran the risk of warranty cancelation by Harley. It is unreasonable to expect a rider to expose themselves to the prospect of uncovered, expensive repairs that would be incurred by using competitor parts in the first two years. Further, any attempts to conjure a warranty exemption fail because Harley's cases are obviously distinguishable.

Harley's remaining arguments are particularized to certain state law claims, and are dealt with *seriatim* below. None of them requires that the Court dismiss any part of this case, let alone its entirety. Harley's conduct was over the line, and very obviously so. Harley itself has already changed its conduct after the FTC became involved. Its ridership, among the most loyal customers of any American company, now seek redress.

## ARGUMENT

To survive a Rule 12(b)(6) challenge, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial

3

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). Courts must accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor. *See, e.g., Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017). After "excising the allegations not entitled to the presumption" of truth, courts then "determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Under this standard, as seen below, all of Plaintiffs' allegations are more than sufficient to survive the pleading stage of litigation. Any factual inquiries beyond plausibility are premature at this pre-discovery stage.

## I.     PLAINTIFFS' MAGNUSSON-MOSS CLAIMS

The CAC properly pleads violations of both the "Tying Provision" and the "Disclosure Provision" of the Magnuson-Moss Warranty Act ("MMWA"). Each rule is fairly straightforward. With two limited exceptions that do not apply here, the Tying Provision prohibits a warrantor from using the warranty to require the purchase of additional parts from a specific maker - here, Harley's own. The Disclosure Rule disallows discretionary or obscure warranty terms that could be a bait-and-switch; the warranty terms must be plain and full. Here, Harley said it "may" void the warranty for the use of competitors' parts, and then directed the riders to their dealers for any specifics. However, the warranty was not disclosed at the dealer locations.

The violations alleged are clear, as evidenced by the fact that the FTC brought its own action alleging violations of both provisions, and Harley immediately entered into a consent decree to resolve that action.

### A.     Plaintiffs Plausibly Allege a Violation of the MMWA's Tying Rule

Per federal regulation, Defendants' warranty practices were impermissible unless Harley agreed to pay for the parts, or had preapproval from the FTC. It did neither. CAC ¶ 115.  Under

4

these circumstances, the "Tying Provision" of the MMWA, 15 U.S.C. §§ 2301-2312, provides that, "[n]o warrantor of a consumer product may condition his written or implied warranty of such product on the consumer's using, in connection with such product, any article or service . . . which is identified by brand, trade, or corporate name." 15 U.S.C. § 2302(c); *see also* 16 C.F.R. § 700.10(a). The FTC's interpretation of § 102(c) clarifies, "No warrantor may condition the continued validity of a warranty on the use of … authorized replacement parts for non-warranty service and maintenance." 16 C.F.R. § 700.10(c). The regulation further illustrates: "*provisions such as, ''This warranty is void if service is performed by anyone other than an authorized 'ABC' dealer and all replacement parts must be genuine 'ABC' parts,'' and the like*, are prohibited where the service or parts are not covered by the warranty."" *Id.*, (emphasis added).

Harley impermissibly and expressly tied its warranty to the use of authorized parts. First, in the section labeled "Keeping it all Harley-Davidson," Harley instructs consumers to *"[u]se only Harley-Davidson approved parts and accessories* that have been designed, tested, and approved for your model and model year motorcycle. . . . *Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories to keep your Harley-Davidson motorcycle and its limited warranty intact*." CAC at ¶ 114 (emphasis added). The limited warranty also says "*use of aftermarket parts may void all or parts of your limited warranty*." *Id.*, ¶ 116 (emphasis added). Under "Service Records," the limited warranty states that "the *use of parts and service procedures other than Harley-Davidson approved parts and service providers may void the limited warranty*."

This express tie is an open-and-shut MMWA violation. Harley repeatedly uses imperatives (*e.g.*, "use only" and "insist"), not recommendations. *See* CAC at ¶ 114. The CAC pleads all necessary elements of a violation of the MMWA's tying rule. *See Schaer v. Newell Brands Inc.*,

5

2023 WL 2033765, at *2 (D. Mass. Feb. 16, 2023) (provision that "attempt to repair or adjust any electrical or mechanical functions on this product.... void this warranty," violated the MMWA).

Harley argues that the Court should differentiate between "may" and "will," but it relies entirely on cases that do not interpret the MMWA. *Dunbar v. Kohn Law Firm, S.C.*, 896 F.3d 762, 765 (7th Cir. 2018), for example, concerned debt collection letters that contained false or misleading statements, not a warranty. Harley cites entirely to debt collection cases with no MMWA claim.

While Harley argues that its use of the phrase "*may* void" rather than "*will* void" precludes the possibility of an express tie, that argument ignores the fact that "may" just means "will in some circumstances."[1]  Harley is not expressing its uncertainty over whether the use of unauthorized parts and services can void the warranty, it is declining to reveal under which circumstances it will or will not take this action, impermissibly leaving purchasers of expensive motorcycles to guess whether they will lose valuable warranty coverage by using the "wrong" parts.  The FTC interpretation of § 102(c) forbids language "*such as* . . . this warranty is void . . . *and the like*."  16 C.F.R. § 700.10(c).  Combining instructions to "use only authorized parts and services" and "insist on use of authorized parts and services" with dire (albeit unclear) warnings that failing to do so "may void" the limited warranty is tantamount to saying that it will do so, and thus falls within the group of prohibited statements.

Even if Harley's use of "may void" could be deemed ambiguous, this would only result in a different violation of the MMWA.  *Id*.  The question of how an ordinary consumer would

---

[1] For example, though Black's Law Dictionary notes that while the word "may" generally "will not be treated as a word of command unless there is something in context or subject matter of act to indicate that it was used in such sense," "courts not infrequently construe 'may' as 'shall' or 'must' to the end that justice may not be the slave of grammar." *Black's Law Dictionary* 979 (6th edition ed. 1990).

6

interpret the instructions is one of fact, inappropriate for resolution on a motion to dismiss. *See*, e.g., *Walkowicz v. Am. Girl Brands, LLC*, No. 20-cv-374-JDP, 2021 U.S. Dist. LEXIS 26319, at *5 (W.D. Wis. Feb. 11, 2021) (12(b)(6) motion "tests the legal sufficiency of the complaint; it is not an opportunity to undertake fact-finding or weigh evidence."); *In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 790 (N.D. Ill. 2016) (factual inquiries regarding warranty's purpose inappropriate for motion to dismiss).

Defendants' citation to *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010), for the proposition that contracts are interpreted as a whole, is similarly unpersuasive. Under that principle of contract interpretation, as discussed above, the fact that Harley listed other specific acts as separate exclusions under the limited warranty implies that Harley was not referring to those excluded acts when it discussed "unauthorized parts and services." It is Defendants, not Plaintiffs, who read the limited warranty in a way that renders provisions superfluous by erasing Harley's multiple statements that an owner's use of unauthorized parts and services may void the limited warranty. Harley's reading renders these provisions redundant with other, lawful provisions within the limited warranty.

Harley also trots out unrelated provisions of the limited warranty in a specious attempt to argue that it was actually referring to those other provisions when it warned that unauthorized parts and services "may void" the limited warranty. Br. at 9-10. Harley's argument is full of holes. First, Harley only addresses the "Service Records" portion of the limited warranty; it ignores the other two sections identified above, including their instructions that consumers must use authorized parts and services to "keep your limited warranty intact." Second, as discussed earlier, the "may void" provisions cited in the CAC identify the use of unauthorized parts as the act that voids the warranty, not any of the other provisions to which Harley points, such as "use of off-road parts" or

7

"alterations outside of Harley-Davison's specifications." *Id.* This is underscored by the fact that, when telling consumers that use of unauthorized parts and services "may void" the limited warranty, Harley instructs the reader to "[s]ee an authorized Harley-Davidson dealer for details," (CAC at ¶ 31) rather than directing them to any more detailed specifications within the limited warranty such as the "Exclusions" that Harley identifies in its motion to dismiss.

Similarly, the fact that Harley states in a separate provision that "even" authorized parts and accessories can void the warranty in no way makes it implausible that using unauthorized parts would also do so. Rather, by advising owners that "even" authorized parts void the warranty, Harley signals the heightened probability that unauthorized parts will likely do so. The same analysis applies to the Consent Decree language Harley cites. Br. at 11-12. Even the warranty's language under its "Note" at the back of the booklet is presented not only as a distinct exclusion from the use of "parts and service procedures other than Harley-Davidson approved parts and service procedures," but also in an entirely different, unrelated section, separated by several pages of text. No reasonable reader would recognize two unrelated clauses separated by several pages as redundant identifications of a single exclusion.

Nor does § 203(a) of the Second Restatement of Contracts save Defendants. While § 203(a) provides generally that contracts should be interpreted so that all their terms are lawful, Note C to § 203(a) cautions more specifically that "[i]f a term or a contract is unconscionable or otherwise against public policy, it should be dealt with directly rather than by spurious interpretation." Further, "[w]hen a written warranty is ambiguous . . . its terms are construed against the drafter." *See, e.g., Reger v. Ariz. RV Ctrs., LLC*, 515 F. Supp. 3d 915, 932 (N.D. Ind. 2021); *Shea v. GM LLC*, 567 F. Supp. 3d 1011, 1019 (N.D. Ind. 2021) (denying motion to dismiss MMWA claim where contract interpretation was ambiguous). Note C to § 203(a) applies here,

and its command should be followed. Harley pressed this contract of adhesion on its riders; it cannot save a facially impermissible provision through clever construction after the fact, particularly because the MMWA and associated regulations mandate that the warranty terms be "simple" and "clear." *See* 15 U.S.C. § 2302(a) (terms must be "simple and readily understood language"); 16 C.F.R. § 700.10(c) (terms must be "clear").

### B. Plaintiffs Have Alleged Harm

The CAC alleges that "Harley-Davidson's conduct caused Plaintiffs, and other Class Members, to pay for Harley-Davidson authorized services or parts that they would not have paid, or, at a minimum, would have paid less for, had Defendants not conditioned or tied warranty coverage to the use of Harley-Davidson authorized services and/or parts." CAC at 155; *see also id.* at ¶ 124 (alleging that Plaintiffs "paid above-market prices" for parts), ¶ 78 (identifying specific premiums charged for "genuine" Harley-Davidson parts), ¶ 35 (explaining how Harley's conduct involved dodging warranty repairs that it otherwise would have had to pay for). The CAC thus alleges economic harm to the Plaintiffs that supports an Article III case or controversy.

Defendants argue that Plaintiffs' MMWA claim must fail because "no Plaintiff alleges that Harley denied warranty coverage simply because they used unapproved parts." (Br. at 12.) Defendants are wrong for two reasons. First, the claim does not arise from each denial of coverage, but from the fact that each Plaintiff paid for a motorcycle and warranty, got less warranty than the law provides, and thus overpaid. The MMWA makes it unlawful to deceive consumers into believing that the warrantor can void their limited warranty if a consumer fails to use "authorized" parts or services. *See, e.g.,* § 700.10(c) (noting that giving the impression that use of unauthorized parts or services would void warranty was deceptive act under the MMWA*); see also Schaer*, 2023 WL 2033765, at *1      ("a product that contains an unlawful warranty - that is voided by any

attempt to repair or adjust any electrical or mechanical functions - is worth less than a product that does not contain such a restriction' … This, is and of itself, would be an injury in fact.").[2]

Second, Harley improperly contests the facts. The CAC expressly sets forth facts demonstrating the precise pattern of warranty coverage denials Harley claims is absent. CAC ¶¶ 32-34. Harley attempts to deflect from Plaintiffs' well-pled allegations by improperly asking the Court to make factual inferences in its favor at the pleading stage. *See Burns v. Paddock*, 503 F.2d 18, 28 (7th Cir. 1974) ("[O]n a motion to dismiss, the allegations in the complaint must, of course, be taken as true with any reasonable inferences drawn in favor of the pleader."); *United States ex rel. Roach Concrete, Inc. v. Veteran Pac., JV*, 787 F. Supp. 2d 851, 857 (E.D. Wis. 2011) (J. Griesbach). For example, Defendants ask the Court to conclude that mounting a flag on the back of a motorcycle created "undue wind drag," such that it was reasonable for Harley to void that user's limited warranty in its entirety. (Br. at 13.) Harley invites the Court to make an improper - and fairly outrageous - inference in Defendants' favor. *See also id.* (asking the Court to accept Defendants' factual assertion that "the dealer denied the coverage not simply because a flag was installed, but because the installation interfered with the performance of the motorcycle," and to

---

[2] It is well settled that a plaintiff "may prove actual damage" "by showing that they paid more than the actual value of the bargain." *Siegal v. GEICO Cas. Co.*, 523 F. Supp. 3d 1032, 1043 (N.D. Ill. 2021) (Coleman, J.). Overpayment for a product is thus a cognizable economic loss. *See In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children."); *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736-38 (2d Cir. 2017) (explaining that price premium satisfied the injury element of a consumer fraud statute). Though certain cases have held that this rule does not apply to warranties by themselves, the case at hand is easily distinguishable given that the tying product at issue is a bundle of a new motorcycle with a warranty. The loss of warranty coverage clearly devalues a new motorcycle, and therefore the loss of value in the warranty here is a cognizable financial injury.

10

conclude that "performance work" was synonymous with use of "unapproved performance enhancing tuners").

The CAC pleads in detail a "course of conduct" of denial supporting Plaintiffs' warranty claims. Defendants may not "ignore[] all the specific allegations" of an alleged pattern. *Deere*, slip. op. at 52. Harley's only answer is to ask that the Court substitute Harley's explanations for the pleaded facts, even though the pleading standard requires otherwise and the parties have not yet conducted discovery and presented the Court with an evidentiary record.

### C. The CAC Properly Alleges a Violation of the MMWA's Disclosure Rule

Plaintiffs adequately allege that Harley violated the MMWA's Disclosure Rule, CAC at ¶¶ 122-23, by keeping its invalidation standards secret. Harley violated the Disclosure Rule by "conceal[ing] the Limited Warranty" and "instruct[ing] consumers to consult with a Harley-Davidson dealer for full details." *Id.*[3] By keeping its invalidation standards close to the vest, Harley could keep riders guessing what would actually void the warranty, which itself violates the MMWA.

Warrantors must "fully and conspicuously disclose in simple and readily understood language the terms and conditions of" limited warranties. 15 U.S.C. § 2302(a). The "Disclosure Rule," the FTC's regulation, requires the warrantor to include in a single document a "clear description and identification of products, parts, characteristics, components, or properties covered by and, where necessary for clarification, excluded from the warranty." 16 C.F.R. § 701.3(a)(2). Harley violated this rule.

---

[3] The CAC further alleges that Harley violates this rule by telling consumers that "[s]ome countries, states, or other locations may require all maintenance and service work to be done by an authorized Harley-Davidson dealer for your warranty to remain in effect. Check with your local Harley-Davidson dealer for local requirements." *Id.*

Harley argues, with no support, that Plaintiffs must identify the specific terms that were omitted in order to plead a claim for violation of the Disclosure Rule. Again, Harley is wrong. What Harley omitted was that it had secret standards that could be only learned, if at all, by consulting a dealer or by costly trial and error that, at best, *risked* voiding the warranty.

Next, Harley asserts that Plaintiffs admit in the Complaint that they were told of all relevant warranty terms "by the Limited Warranty documents." But Harley's argument is facially untenable. "Check with your local Harley-Davidson dealer" is not a warranty term. Nor is it, as Harley maintains, a cross-reference to the limited warranty's "exclusions" section, or the "unapproved modifications" therein.

### D. Pre-Sale Warranty Obligations Do Not Help Harley

Harley's challenges to Plaintiffs' claims under the FTC Act's Pre-Sale Availability Rule ignore Plaintiffs' well-pleaded allegations and are simply incorrect under the rule itself. Under that rule, warrantors must supply materials and ensure that sellers "make a text of the warranty readily available for examination by the prospective buyer by: (1) Displaying it in close proximity to the warranted product . . . or (2) . . . placing signs reasonably calculated to elicit the prospective buyer's attention in prominent locations in the store or department advising such prospective buyers of the availability of warranties upon request." 16 C.F.R. § 702.3(b).

Harley argues (incorrectly) that Plaintiffs have asserted a violation of § 702.3(a) of the Pre-Sale Availability Rule without alleging that Harley failed to supply sellers with the necessary materials. This is doubly wrong. Section 702.3(a) sets forth the seller's duties, which apply to the dealer, not to Harley as the Warrantor. The CAC invokes the *warrantor's* duties under § 702.3*(b)* - not the dealer's duties under §702.3*(a)* - and also expressly alleges that "Harley-Davidson violates this regulation because it does not provide its authorized dealers with signs displaying the

12

text of the Limited Warranty, or otherwise require its dealers to make the Limited Warranty terms available to all customers before purchase." CAC, ¶ 121.

Defendants also argue that Plaintiffs cannot allege a plausible claim under the Pre-Sale Availability Rule because Plaintiffs have admitted that they received notice of the limited warranty's terms. (Br. at 15.) However, Plaintiffs have alleged that the limited warranty documents failed to disclose the real terms - the actual practice that riders could only learn from a dealer, if they could learn them at all. CAC ¶¶ 122-123. Defendants' argument also overlooks the distinction between pre- and post-sale notice of the limited warranty's terms. Plaintiffs did not allege that the limited warranty was provided before sale. Rather, Plaintiffs specifically allege that Harley, as warrantor, did not give the necessary materials to its sellers, CAC, ¶ 104, such that the materials were not displayed, and the plaintiffs were not given notice of the limited warranty before they purchased their motorcycles, which violates the Pre-Sale Availability Rule.

Harley's fallback is that it supplied the limited warranty via the internet as allowed by 16 C.F.R. § 702.3(b)(2). This, too, is misplaced. To satisfy that method of dissemination, Harley must meet all four additional criteria laid out in § 702.3(b)(2)(i)-(iv), which they did not.[4] Accordingly, Harley has not satisfied the requirements under this subsection, and the motion to dismiss Plaintiffs' claims under the Pre-Sale Availability Rule must be denied.

### E. The FTC Action Supports the Plausibility of the MMWA Allegations

The commencement and resolution of the FTC action supports the plausibility of Plaintiffs' MMWA allegations. Harley erroneously and illogically argues that the FTC's filing of a complaint against it arising out of the same misconduct has no bearing on this case. Congress authorized the

---

[4] Under § 702.3(b)(2)(iv) the warrantor's website must contain terms "sufficient to allow the consumer to readily identify . . . the warranty terms that apply to the specific warranted product." The CAC alleges that directing consumers to "local dealers" is the opposite of stating the terms.

13

FTC to interpret and enforce the MMWA. As such, the FTC is entitled to deference in its interpretation of the MMWA, and its own enforcement action against Harley supports the plausibility of Plaintiffs' allegations that mirror the FTC's Complaint.[5] *See, e.g., Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *Cisneros v. Lynch*, 834 F.3d 857, 862 (7th Cir. 2016) (applying *Chevron*). The FTC's claim that Harley violated the Tying Rule substantiates the plausibility that Harley's "may void" language falls within the scope of conduct prohibited under the MMWA. Similarly, the FTC's claim that Harley violated the Disclosure Rule by referring purchasers to "local dealers" to discover precisely what would void the warranty, strongly supports the plausibility of Plaintiffs' allegations.

Harley's arguments to the contrary are not persuasive. Harley first posits that the FTC might not even have published its complaint if Harley had not agreed to settle the case. This counterfactual is nothing more than speculation. Harley's next argument - that the Court should assume the defenses Defendants chose not to litigate against the FTC would have succeeded had Harley instead chosen to move to dismiss the FTC's Complaint - is even more speculative, and it requires factual inferences and assumptions be made in Harley's favor, which would be improper on a motion to dismiss. Br. at 15. Finally, Defendants argue that the FTC Complaint and Consent Decree are irrelevant because they do not include an admission of liability, a fine, or findings of fact. *Id.* at 15-16. But the FTC's analysis and conclusion are probative not only of the proper interpretation of the Tying and Disclosure Rule, but also that Harley was in violation of them. Plaintiffs recognize that Harley's Consent Decree is not preclusive, *In re Linerboard Antitrust*

---

[5] The FTC asserted violations of the Tying and Disclosure Rules, but not the Pre-Sale Warranty Rule.

*Litig.*, 223 F.R.D. 335, 338 n.2 (E.D. Pa. 2004), but it does support plausibility.

The cases Defendants cite do not change this analysis. The sentence Harley cites from *Pension Tr. Fund for Operating Eng'rs v. Devry Educ. Grp.*, 2017 U.S. Dist. LEXIS 200272, at *33 (N.D. Ill. Dec. 6, 2017), was directed to whether a consent decree evidenced the defendant's notice of a claim's falsity years prior to the entry of that settlement, which is entirely irrelevant here. Similarly, in *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015), the Court was addressing whether it could infer from an FTC complaint and Consent decree alleging one set of facts, that a second, unalleged set of facts had occurred. Here, Plaintiffs submit the FTC complaint only as corroboration of the essentially identical facts pled between this and that action. *See McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 122 (1st Cir. 2014) ("[B]ecause Massachusetts has folded the FTC Act into Chapter 93A, unfair or deceptive conduct that violates the FTC Act also violates Chapter 93A.").

## II. PLAINTIFFS' ANTITRUST CLAIMS

To establish an illegal tying arrangement,[6] "a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected." *Reifert v. S. Cent. Wisconsin MLS Corp.,* 450 F.3d 312, 316 (7th Cir. 2006) (quoting *Carl Sandburg Vill. Condo.*

---

[6] As an aside, though this case proceeds under various state laws rather than under the federal Sherman Act, Harley makes no attempt to distinguish between federal and state law standards. Plaintiffs agree that, as to the nature of impermissible conduct, that they are generally interchangeable. In general, federal Section 1 ties are judged on a *per se* standard. Wisconsin's antitrust statute, for example, was intended to be a reenactment of the federal Sherman Antitrust Act and is generally controlled by federal court decisions. https://docs.legis.wisconsin.gov/statutes/statutes/133/03, citing *Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011 (1999).

15

*Ass'n No. 1 v. First Condo. Dev. Co.,* 758 F.2d 203, 207-08 (7th Cir.1985)); *see also In re Deere & Company Repair Service Antitrust Litig.*, MDL No. 3030 (N.D. Ill., November 27, 2023) ("*Deere*"), slip op. at p. 79 (adding "(4) the tying seller has an economic interest in the sales of the tied product").  As described herein, Plaintiffs have done just that, through three separate theories, which Defendants fail to distinguish: through a tie designed to cause restraint of trade, through a tie with a captive aftermarket, and through a tie constituting monopolization.  *See, e.g.* CAC ¶¶ 39-40; 51.  It is important to recognize that, though Plaintiffs aver that Harley has violated antitrust law through all three, if one fails the others still stand.

### A.    Plaintiffs Have Alleged an Antitrust Tying Arrangement

Defendants attempt to poke holes in Plaintiffs' antitrust allegations through five equally unsuccessful tactics, discussed below in turn.  As explained below in greater detail, the simple facts are that: (1) Harley forced customers of its new motorcycles (bundled with warranties) to buy Harley parts, contrary to Defendants' seeming attempts to create a new kind of standard that would ban any kind of warranty arrangements from being considered in a tying case; (2) Plaintiffs have sufficiently alleged relevant markets, bolstered with extensive research and factual allegations; (3) Plaintiffs have adequately alleged restraint of trade and a tie constituting monopolization; (4) Harley misplaces case law in order to impose a burden on Plaintiffs not allowed in this Circuit; and (5) it is entirely permissible for Plaintiffs to bring their claims under Wisconsin antitrust law, as Harley is based in and submits to that jurisdiction.

First, Defendants overlook key allegations.  Here, the pleaded tying product is a bundle, consisting of the motorcycle with the warranty.  CAC ¶¶ 30, 39.  They are not sold separately. Each new motorcycle is sold together with a warranty, just as surely as it is sold with paint, a seat, and a headlight.  This allegation distinguishes this litigation from many of Defendants' cited cases and undermines their arguments.  For example, Harley claims that "[e]ven if a consumer wanted

or needed parts during the limited warranty period, the alleged 'risk' of losing the warranty does not create a tie because the consumer is not precluded from buying the motorcycle."  Br. at 20 (citing *Va. Panel Corp. v. MAC Panel Co*., 133 F.3d 860, 870 (Fed. Cir. 1997) (holding that "voiding a warranty, or threatening to do so, does not constitute use of a patent to control unpatented products" and affirming jury verdict finding no illegal tying arrangement), and *DXS, Inc. v. Siemens Med. Sys.*, 991 F. Supp. 859, 864 (E.D. Mich. 1997) (out-of-circuit district court found insufficient evidence of tie at summary judgment stage)).

Defendants also ignore that an illegal tying arrangement can *alternatively* consist of forcing a promise not to buy from a competitor, which Harley has done here. CAC at ¶ 114.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 463 (1992) ("Finally, respondents have presented sufficient evidence of a tie between service and parts.  The record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's.").

Harley's demand that riders buy only its branded parts or have the warranty protection revoked, drives up the cost of owning a motorcycle altogether, which this Circuit has expressly recognized as tying.  *See Viamedia, Inc.,* 951 F.3d at 471 (holding that "[i]n applying the antitrust laws, we care more about economic substance than about form" and that the policy of banning the use of Viamedia had the "practical effect" of forcing the use of Comcast's ad rep services), citing *Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 272 (6th Cir. 2015) ("When a defendant *adopts a policy that makes it unreasonably difficult or costly to buy the tying product* (over which the defendant has market power) without buying the tied product from the defendant, it 'forces' buyers to buy the tied product from the defendant and not from competitors") (emphasis added).

In *Deere*, the Court recently considered an allegation very like the one at issue - that a monopoly tractor maker unlawfully prevented its buyers from using any but its own dealers' repair

services - and held that the plaintiffs stated a claim for unlawful tying of a derivative aftermarket, both under Section 1 and Section 2 of the Sherman Act. *Deere*, slip op. at 89.

Further, Harley's only answer to Plaintiffs' allegations is to repeatedly proffer its own contradictory factual assertions or explanations, which are not appropriate in a motion to dismiss. *See e.g.* Br. at 13; *see also Deere*, slip op. at 52, 71 ("Deere does not contest the truthfulness of the allegations – because it can't with a Rule 12 motion"). Plaintiffs demonstrate that this arrangement was impactful. For example, part of Harley's modus operandi was to ensure that dealers invalidated as many of these warranties as possible, by delaying reimbursement for warranty repairs. CAC ¶ 34. Plaintiffs plead that customers did not modify their bikes because Harley's terms were "see the dealer." *Any* modification could lead to a warranty being invalidated not - just those that caused an issue. *See e.g.* CAC ¶¶ 31, 33 (wherein the mere addition of a flag caused a warranty to be cancelled in its entirety). This is not a case where warranties were cancelled because consumers' unauthorized repairs heightened the risk on the part of the warrantor, as seen in the only cases Defendants can cite (discussed below). Purely cosmetic alterations and additions - even a small flag - would cancel a warranty that a consumer needed to repair an unrelated issue. CAC ¶ 33. *See Deere*, slip op. at 52, 71 ("Deere does not contest the truthfulness of the allegations - because it can't with a Rule 12 motion").

Harley argues that "Plaintiffs do not allege that consumers were forced to buy Harley-Davidson parts in order to buy a motorcycle. Consumers could buy a Harley-Davidson motorcycle and no parts during the limited warranty period, for example." (Br. at 20). But this simply ignores the aforementioned rule that tying exists when a firm makes it too expensive or burdensome to use a competitor's product. *See, supra, Collins Inkjet*, 781 F.3d at 272. Every rider overpays due to the warranty violations. Each motorcycle purchaser overpays because of the deficient warranty,

but further, the entire subset of those riders who also buy parts is additionally overcharged on the parts. Harley's improper tie stifled competition from non-Harley parts makers, trapping the warranty holders into buying only Harley's branded versions, and allowing Harley to charge a supercompetitive price for its parts. Parts buyers are alleged to constitute a distinct class, CAC ¶ 127, with their own additional injury and damages.

It is no answer to say that Harley buyers could factor in the limitations to their purchases. The CAC alleges that motorcycle repairs are costs that cannot be reliably anticipated two years in advance with accuracy - in other words, these consumers are not able to effectively forecast "lifecycle cost." As the Supreme Court recognized, "[l]ifecycle pricing is complex, durable equipment is difficult and costly." *Eastman Kodak Co.*, 504 U.S. at 473. A customer factoring a captive aftermarket into initial purchase "must acquire a substantial amount of raw data and undertake sophisticated analysis [of] price, quality, and availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts." *Id.*

In *Eastman Kodak*, the Supreme Court was grappling with copying and micrographic equipment; even in the 1990s, that would not have presented the complexity of lifecycle pricing in this case, because the Harley ridership seeks to personalize and upgrade their motorcycles. While the copy equipment in Kodak was presented as a matter of maintaining function, the ridership here would have to predict both what they might want to upgrade or customize after they buy the motorcycle, and then also forecast the cost, surely an unreasonable prediction to ask of a consumer. *See*, *e.g.*, CAC ¶ 80. That leaves aside the possibility that the aftermarket parts will replace those that become cosmetically damaged by normal wear and tear, and that the owner may want to replace with a custom part, which is even less susceptible to reasonable forecasting. Harley

19

avers that "[w]hat Plaintiffs' allegations actually speak to is 'the common human inability to predict the future with certainty…'  Br. at 39 (quoting Xerox Corp. v. Media Scis., Inc., 660 F. Supp. 2d 535, 549 (S.D.N.Y. 2009)).  But this ignores the specific lifecycle pricing issues that motor vehicles face in particular.  In *Deere*, the Court closely analyzed allegations that lifecycle cost could not be readily forecast, and found that such allegations supported a tying claim in a derivative aftermarket very similar to that at issue here.  *Deere*, slip op. at 53-55, 59-61.  Harley points to no other case for a contrary proposition, and none in which a manufacturer was permitted to restrict a motor vehicle or equipment owner to only its preferred parts or repairs.

*Sheridan v. Marathon Petroleum Co. LLC,* 530 F.3d 590, 596 (7th Cir. 2008), which Harley cites for the proposition that an "additional cost" akin to the loss of warranty coverage "is not a penalty... to force the use of a product" is inapposite here.  *Sheridan* has nothing to do with warranty coverage, and instead concerns the requirement of one specific credit card processing service for one credit card out of many that the defendant's dealer franchises accepted.  There, the dealers were entirely free to accept other credit cards and to use whatever processing services they liked, and defendant imposed no added cost to doing so, though the plaintiff might have found an alternate system unnecessary and duplicative of the system required for processing the defendant's branded cards.  Here, Harley imposes *only* Harley branded parts for *all* new bikes under warranty, with the threat that if customers do not comply they will lose warranty coverage, causing their overall repair costs during the warranty period to potentially skyrocket.  CAC ¶ 98.

It is telling that Harley cannot find any case within this Circuit to support its argument here, instead importing distinguishable cases from other Circuits and then gerrymandering them into an invented rule not supported by any case Harley cites - that warranties cannot be used in tying cases at all.  Indeed, Harley blithely states that just because warranties have requirements does not mean

20

they are anticompetitive ties (Br. at 20-21), but this glosses over the clear unlawful nature (as the FTC saw it) of Harley's warranties (as the FTC saw it) and the specific effects on the tied market alleged by Plaintiffs. Indeed, the inapposite (and non-binding) requirements cited by Harley in its brief in support of this proposition point not to the idea that manufacturers have the unfettered right to use warranty coverage to place as many restrictions on their products as they please, but rather only that they can instead condition their coverage to limit damage that might be caused by a consumer unknowingly using products not meant for the products under warranty. Neither *GMC v. Gibson Chem & Oil Corp.,* 786 F.2d 105, 110 (2d Cir 1986) nor *Fido's Fence, Inc. v. Canine Fence Co.,* 672 F. Supp. 303, 312 (E.D.N.Y. 2009) concern blanket bans on non-branded repair parts, but instead involve manufacturer recommendations that certain brands of parts be avoided by the consumer to limit the risk of damage to the original product - a strategy used by manufacturers to limit the amount of repairs they are obligated to pay for.

The rest of Harley's citations are also unavailing; in *HDC Med., Inc. v. Minntech Corp.,* 411 F. Supp. 2d 1096, 1102 (D. Minn. 2006), the tie failed because customers were free to use third-party software, and Minntech's proprietary software was not the only economic option. Similarly, in *RX Sys. v. Med. Tech. Sys.*, 1995 U.S. Dist. LEXIS 14214, at *16 (N.D. Ill. Sep. 29, 1995), which had to do with machines that read pill cards, and limitations on modifying the machines to accept third party cards, there was no prohibition on using third party pill cards and the warranties for the machines lasted only 90 days. *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006), meanwhile, is entirely inapposite as it involves two separate patented drugs sold together that could each be freely bought separately without restraint, though buying them together resulted in a discount. And Harley even quotes from *SMS Sys. Maint. Servs. v. Dig. Equip. Corp.*,

188 F.3d 11, 20 (1st Cir. 1999)[7] that warranties acting as "a *subtle disincentive*" (emphasis added) are not "inherently anticompetitive." But there is no "subtle disincentive" in the case at hand. Any single alteration or cosmetic enhancement on a motorcycle with a non-Harley product runs the risk of voiding the warranty on a new, $20,000+ bike. If one day the engine blows, the rider is left up a creek without a paddle. No reasonable customer would risk this.

Indeed, if there is a rule to be gleaned from Harley's selected cases, it is that manufacturers can use product recommendations to limit their costs for warranty repairs. But Harley's warranty is extreme - it bans *outright*, on threat of voiding the warranty, all non-branded parts, and this threat is carried out. See e.g. CAC ¶ 33. Harley proposes a new rule that a warranty can never be a tie, no matter what it says or the circumstances surrounding it and the relevant product markets - which is simply not the law anywhere, and would permit conduct expressly forbidden under the MMWA.

Harley's warranty limitations, challenged by the FTC, cut off any meaningful consumer choice as to parts for a period of two years. This served to as means for Harley to foreclose competition from parts manufacturers for customers who might want to customize their new bikes, without any regard to the issues of potential damage cited by *GMC* or *Fido's Fences*. This impacted the price of parts as a whole, and helped create barriers to entry for new competition into said parts market. *See* CAC ¶¶ 92, 98.

---

[7] While the First Circuit ruled in *SMS Syst. Maint. Services* that the computer and the warranty were separate products that rested on uncontroverted testimony that the computer was often sold with different kind of warranty packages, or without any at all. Here, new motorcycles are sold automatically as a bundle with the one specific warranty at issue in this case; there is no customer choice.

22

Next, Defendants pin their hopes on the Eighth Circuit's ruling against a warranty constituting a tie in *Marts v. Xerox*, 77 F.3d 1109, 1112 (8th Cir. 1996).[8] Their argument again comes up short. First, that case was decided on summary judgment with a complete factual record, not on the pleadings. "District courts skate on wafer-thin ice when they rely upon summary judgment cases in deciding motions attacking the pleadings." *Deere*, slip op. at 40 (citing cases). In addition, in *Marts*, Xerox's warranty offered servicing of copiers in a flat exchange for abiding by the warranty's requirement to use only Xerox cartridges and the Court appears to have inferred a "lifecycle pricing" calculus. This allowed customers to be able to shop around[9] and figure out whether or not it was cheaper to buy different ink cartridges and receive service elsewhere than to keep the Xerox warranty.

But Plaintiffs have specifically pleaded the inability to predict lifecycle pricing here. CAC ¶¶ 72-84. That is to say that unlike the consumers of Xerox copiers, motorcycle riders are unable to accurately foresee what future repair costs of their bikes are. Moreover, unlike the consumers of copiers, which are stationary objects that require predictable levels of servicing, Harley consumers ride $20,000+ motor vehicles through changing traffic, weather, and road conditions that present constant and unpredictable risks to the bike. There is simply no way to know how many repairs will be needed, and the risk of riding around on an expensive new bike without a warranty is far greater than the risk of having to pay for non-branded copier servicing - the cost of

---

[8] *Hypertherm, Inc. v. Am. Torch Tip Co.,* 2007 U.S. Dist. LEXIS 67579, at *17 (D.N.H. Sept. 11, 2007), which Defendants cite to quote *Marts*, is distinguishable from the facts in this case as well as it concerned the threats to customers not to use third-party parts *only after* they had purchased the alleged tying products in question.

[9] Xerox did not have a monopoly in the primary market, but here, Harley's monopoly in the market for large, American roadgoing motorcycles means that competition in the primary market – shopping around for the tying product with the competitive aftermarket, rather than the tied product – cannot discipline prices in the tied product market. CAC ¶ 76.

23

which is discrete and easily researchable. *See Deere*, slip op. 53-55, 59-61 (information to lifecycle price unavailable). Plaintiffs are not "free to forego the benefits of a warranty" (*id.*) because, as the Supreme Court warned in *Eastman*, 504 U.S. at 473, the risks of doing so are far too unknowable and great.

### B. Plaintiffs Have Plausibly Alleged Antitrust Markets

"The proper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* at 482 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (J. Sotomayor); *accord E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 444 (4th Cir. 2011). Plaintiff need only plead "the rough contours of a relevant market," *Deere* slip op. at 42, citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004).

For antitrust purposes, a relevant market "is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916-17 (7th Cir. 2020) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("*Cellophane*")). Its outer limits "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id*. at 917 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 327 (1962)). Particularly at the motion to dismiss stage, both product markets alleged by Plaintiffs more than clear this low bar.

1.      **The CAC Sufficiently Pleads a New Market for American-Made, Large, Roadgoing Motorcycles**

Defendants ignore or contest the well-pleaded facts of the CAC arguing that Plaintiffs' allegation that the tying market comprised of American-made, new, large roadgoing bikes, *see* CAC ¶ 32, is inadequate for three reasons: (1) American-made motorcycles are interchangeable with foreign-made motorcycles; (2) contrary to Plaintiffs' express allegations, the market identified by Plaintiffs is actually a single-brand market and therefore is not plausible; and (3) the market should include used bikes. Each argument fails for multiple reasons.[10]

The Supreme Court has recognized that "within [a] broad market" - such as motorcycle - "well-defined sub-markets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co.*, 370 U.S. at 325 (footnote omitted). I t has identified several "practical indicia" of an economically distinct submarket: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id*. Consideration of these types of factors demonstrates that the market for new, American-made, large, roadgoing motorcycles is such a submarket.

As Plaintiffs allege, American-made bikes do not experience cross-elasticity of demand with non-American-made bikes. CAC ¶¶ 48, 49. Beginning in the 1980s, Harley focused its efforts on large displacement engines - bikes on which, due to tariffs and other reasons, Japanese manufacturers could not and did not compete - and so Japanese manufacturers continued their focus on small-engine bikes, known as Universal Japanese Morotcycles (or "UJM bikes"). CAC ¶¶ 30-32. Consumers' differentiation between American-made bikes and UJM bikes have

---

[10] Defendants do not contest that defining the relevant product market based on engine size ("large") or intended use ("roadgoing"), *see* CAC ¶¶ 44-46 are well-supported differentiations.

persisted ever since.  Consumers and publishers recognize American-made bikes as their own distinct product market, with a dedicated enough consumer base to support a specialty periodical, *American Iron Magazine*, for thirty years, CAC ¶ 48.

Harley owners are dedicated to expressing their patriotism through riding an American-made bike and would not ride a foreign-made bike even if it were a comparable machine at a lower price. CAC ¶ 49.  Harley itself understands this commitment and seeks to profit from it, adopting patriotic iconography for its products and selling USA-themed merchandise for its bikes. CAC ¶ 49-50.  On multiple occasions, this patriotic aspect of the subculture has been the subject of ethnographic academic study.  CAC ¶ 51-52.  These shared understandings among consumers and sellers that foreign-made products could not be satisfactorily substituted for those inside the market suffice to adequately allege the relevant product market. *Dixon v. Nat'l Hot Rod Ass'n*, No. 119CV01470JRSDML, 2021 WL 1175198, at *7 (S.D. Ind. Mar. 29, 2021).

And, for that matter, Harley's reliance on the *German Auto* decision for a rule against product markets defined by origin is misplaced. In that case, the plaintiffs who pleaded a "German Luxury Vehicles" submarket also pleaded direct competition between German and non-German vehicles and notably did not plead any of the factors Plaintiffs allege here, such as consumer differentiation between American-made motorcycles and non-American-made motorcycles, and a lack of cross-elasticity of demand between those market segments.  *See In re German Auto. Mfrs. Antitrust Litig.,* 612. F. Supp. 3d 967, 980 (N.D. Cal. 2020).

Moreover, Defendants' contention that Plaintiffs have pleaded a single-brand market is simply false, and ignores multiple factual allegations that the Court must at this stage accept as true.  The market pleaded by Plaintiffs includes not just motorcycles produced by Harley, but also multiple others, including most notably the longstanding, though less ubiquitous, Indian.  CAC

26

¶¶ 48, 51, 52. Harley's dominance in this market belies its market power, but it does not transfigure the product market defined by Plaintiffs into one comprising a single brand, and Defendants' arguments about a single-brand market therefore are irrelevant.[11]

Finally, used bikes are not reasonably interchangeable with new bikes within the large, American-made, roadgoing motorcycle market, and Plaintiffs' exclusion of used bikes from the relevant product market is plausible. Manufacturers' warranties are only available with new bikes, and consumers cannot substitute used bikes for new bikes without sacrificing this important, non-replaceable attribute. CAC ¶ 47. Defendants' say-so that the Court should not accept this distinction as relevant to consumers' purchasing decisions is precisely the same argument the Seventh Circuit has rejected in past market-definition decisions: "[The pleading stage] is not the time to evaluate the merits of [Plaintiffs'] allegations, and that in any event is a task that requires expert testimony." *Vasquez*, 40 F.4th at 586. The sole case cited by Defendants, *First Priority Emergency Vehicles, Inc. v. REV Ambulance Group Orlando, Inc.*, No. 3:18-CV-9805-BRM-DEA, 2020 WL 2029344, at *4 (D.N.J. Apr. 28, 2020), is distinguishable because there, the complaint included allegations essentially admitting that at least in some instances the large availability of used ambulances had affected sales of new ambulances, indicating that cross-elasticity of demand did in fact exist between used and new ambulances. No such facts have been alleged here. The exclusion of used motorcycles from the relevant product market is plausible.

In any event, the definition of the relevant product market is inappropriate for resolution on a motion to dismiss, when, as here, the Plaintiffs have more than plausibly alleged a clearly

---

[11] They are also legally incorrect. As the Supreme Court has recognized, "in some instances one brand of a product can constitute a separate market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482, 112 S. Ct. 2072, 2090, 119 L. Ed. 2d 265 (1992) (citing *cases.) See also Deere,* slip op. 55 (accepting well-pled single brand aftermarket).

27

defined market, with extensive research, economic analysis, and academic studies backing it up. Any factual disagreements must be resolved after the discovery stage of litigation.

### 2. The CAC Sufficiently Pleads a Compatible Parts Market

Defendants seemingly accept - as they must, on a Rule 12 motion, as well as by force of logic - that for Harley owners, no cross-elasticity of demand exists between Harley-compatible parts and non-compatible parts. *See* CAC ¶¶ 39, 54. Their sole attack on the Compatible Parts Market pleaded by Plaintiffs, *see* CAC ¶¶ 54-74, is merely that not all motorcycle parts are interchangeable with one another - e.g., a customer would not buy an armrest to replace a windshield. Br. at 49. Implicit in this argument is the idea that Plaintiffs should have pleaded not one unified Compatible Part**s** Market but rather thousands of individual Compatible Part Market**s** - a Compatible Windshield Market, a Compatible Armrest Market, and so on. But Defendants' argument is contrary to decades of controlling authority. "[P]roducts need not be fungible to be considered in the relevant market," *Cellophane*, 351 U.S. at 394, and to require a showing that Defendants have "monopoly power in thousands of markets would be both unduly burdensome and pointless." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1205 (9th Cir. 1997) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 327 (1962) (affirming market definitions for men's, women's, and children's shoes and rejecting defendant's argument for further differentiation by age, style, or other characteristic because "[f]urther division [of the product market] does not aid us. . . .")).

"The relevant market for antitrust purposes is determined by the choices available to [Harley] owners." *Eastman Kodak,* 504 U.S. at 481–82 (1992) (upholding one market comprising all parts of Kodak photocopiers and micrographic equipment and one market for servicing of all those machines). As the U.S. Supreme Court has noted, "[C]ourts should 'combin[e]' different products or services into 'a single market' when 'that combination reflects commercial realities.'"

28

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (quoting *Grinnell Corp.*, 348 U.S. at 572). In *Grinnell Corp.*, Justice Douglas suggested that distinct, non-interchangeable services could be grouped together into one market if "companies recognize that to compete effectively, they must offer all or nearly all types of service." 348 U.S. at 572; *see also Weiss v. York Hosp.*, 745 F.2d 786, 826 (3d Cir. 1984) ("Where, however, several goods or services are generally offered by the same providers, it is not unreasonable for a jury to conclude that the market for antitrust purposes includes all of those goods or services." (citations omitted)). Furthermore, "[a] cluster of products," such as Harley-compatible parts, "can comprise a relevant product market if the cluster is itself an object of consumer demand." *Sharif Pharmacy, Inc.*, 950 F.3d at 918 (rejecting defendant's contention that market comprising all prescription drugs, which were obviously not interchangeable with one another, was impermissibly broad) (cleaned up)). For example, in *United States v. Phillipsburg National Bank and Trust Company*, the Supreme Court grouped multiple financial services together into a relevant market of "commercial banking" because customers generally obtain all banking services from one place. 399 U.S. 350, 360-61 & n.4 (1970). *See Deere* (tied market for "repair services" for various John Deere tractors and combines).

Here, Plaintiffs' allegation that Harley-compatible parts are distinct from non-compatible parts is self-evident: a Harley owner logically would not repair their bike with parts that would not be functional when used on a Harley bike, and so prices of non-compatible parts cannot discipline prices of Compatible Parts. *See* CAC ¶¶ 39, 54. Compatible Parts are also distinct in that they use imperial or SAE units rather than metric units used by parts compatible with Japanese bikes. *Id.* Sellers of Harley-compatible parts generally manufacture or sell a broad array of such parts, and group and display them together as Harley-compatible (or similar categorization) for consumer ease. *Id.* ¶¶ 39, 58-60, 62, 68-72. Additionally, consumers consider and advise one another about

29

where to buy compatible parts, generally, rather than distinguishing among sellers of compatible armrests, windshields, or headlights, *see, e.g., id.* ¶ 61 n.15.; ¶ 66 n.25, ¶ 67 n.27. One obvious reason for this is that Harleys are long-lived and can last for generations, *id.* ¶ 3, from which it can be reasonably inferred that loyal Harley owners will be making multiple different repairs and customizations over the life of the bike, *id.* ¶ 3 - first a windshield, later an armrest, and so on - and to source them, owners will turn each time to the unified Compatible Parts Market, not to a discrete market focused solely on that single compatible part. Thus, it is the marketplace for these multiple parts that is the object of consumer demand. *Sharif*, 950 F.3d at 918. The Compatible Parts Market properly combines different parts into a single market because that combination "reflects commercial realities." *Am. Express Co.*, 138 S. Ct. at 2285 (quoting *Grinnell Corp.*, 348 U.S. at 572).

### C. Plaintiffs Have Alleged Restraint of Trade

To allege a restraint of trade in a rule of reason case, a plaintiff must "plead 'anticompetitive effects,' and 'that the injury complained of be of a type that the antitrust laws were designed to guard against, and further that the antitrust violation be the direct cause of plaintiff's injury.'" *In re Dealer Mgmt. Sys. Antitrust Litig.,* 313 F. Supp. 3d 931, 950 (N.D. Ill. 2018) (quoting *Havoco of Am., Ltd. v. Shell Oil Co.,* 626 F.2d 549, 556 (7th Cir. 1980)); *see also Leegin Creative Leather Prod., Inc. v. PSKS, Inc.,* 551 U.S. 877, 885 (2007) (rule of reason ultimately requires "the factfinder [to] weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition"). "[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express Co.,* 138 S. Ct. at 2284 (2018).

30

### 1.  Market Power

"Market power is the 'power to raise prices significantly above the competitive level without losing all of one's business' and is 'normally inferred from the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography.'" *Vital Pharms., Inc. v. Berlin Packaging LLC,* 632 F. Supp. 3d 780, 787 (N.D. Ill. 2022) (quoting *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666-67 (7th Cir. 1987)). The CAC alleges a monopoly in the bike market, which is a higher standard.  CAC ¶ 94.  But Harley essentially makes the argument that a specific market share needs to be pleaded - and that if a plaintiff does not have that information *at the pleading stage*, a case should be dismissed. Br. at 6. This is not true. "[E]conomic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market."  *Deere*, slip op. at 80, citing cases.  Alleging defendant's dominant position in the tying market (as the CAC does, *see, e.g.,* ¶50) is sufficient.  *Id.*

When the seller's share of the market is high, or when the seller offers a unique product that competitors are not able to offer, the likelihood is that market power exists.  *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 826 F.2d 712, 720 (7th Cir. 1987).  Harley's market power in the tying market is undeniable: not only is it is the number one seller of new motorcycles in the U.S., but as one of only two heritage American motorcycle brands to have survived past the Great Depression it dwarfs its only significant competitor in the market, Indian, by nearly 6 to 1, as Plaintiffs plead. CAC ¶ 50.  Plaintiffs do not yet have the exact percentage of Harley's market share in the tying market, but based on the above-pleaded ratio it is a reasonable inference that it is at *least* around 80%.[12]  Harley offers no authority to show why this is not sufficient.

---

[12] To be exact, as pleaded in the CAC, Harley is larger than Indian by a ratio of 5.86 to 1. If Harley and Indian are the only competitors in the market, as it generally appears, then Harley has an

Moreover, a defendant need only have market power in the tying market. *Packaging Supplies, Inc. v. Harley-Davidson, Inc.,* No. 08-CV-400, 2009 WL 855798, at *5 (N.D. Ill. Mar. 30, 2009) (a plaintiff making a tying claim "need only present allegations that the tying seller has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product") (citing *Reifert,* 450 F.3d at 316-17).

Regardless, Plaintiffs have sufficiently shown that Harley dwarfs its competitors in both of the relevant markets alleged (CAC ¶¶ 50, 95), even if they have not yet had access to discovery materials which will provide the exact numbers Harley seems to think are required.

What Harley appears to attack here is the definition of the bike market itself, which it evidently believes should expand to include every single motorcycle made anywhere on the globe. Br. at 29. By grouping in Harley's large roadgoing bikes with motorcycles made for and marketed to a completely different consumer base - *i.e.*, those who prefer the sleeker, sportier UJM bikes - Harley manufactures its own proposed market share of 21.1% (Br. at 28) in an attempt to argue that it lacks market power. But for the reasons stated above, those arguments fail, certainly at the pleading stage. [CITE]

### 2. Volume of Commerce

In this Circuit, "'[t]he requirement that a substantial volume of commerce in the tied product market be affected by the tie does not look to the percentage or share of the tied market affected. Rather, the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie.'" *Gumwood HP ShBring Partners, L.P. v. Simon Prop. Grp., Inc.,* No.

---

85.42% market share. 5.86 / 6.86 = 0.85422741. If allowing for remaining smaller competitors, generously estimated at half of Indian's market share, then Harley still comes out with a 79.61% market share, or 80% rounded up. 5.86 / (5.86 + 1 + 0.5) = 0.79619565.

3:11-CV-268 JD, 2013 WL 3214983, at *12 (N.D. Ind. Mar. 13, 2013) (quoting *State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.,* 730 F. Supp. 826, 931 (C.D. Ill. 1990)).  The Supreme Court has long held that even amounts as low as $60,800 can suffice as "substantial" in the context of volume of commerce.  *United States v. Loew's, Inc.,* 371 U.S. 49 (1962).

It is *undisputed* that Harley is the top-selling motorcycle manufacturer in America, with an annual revenue of $5 billion. CAC ¶ 37.  And it is the top seller of Compatible Parts in the country as well with annual revenue of approximately $482.2 million - 23 times the size of its next competitor.  CAC ¶ 95.  Since the volume of commerce involved is clearly substantial, Harley attempts to press the "volume of commerce" into service to again attack market definition.  This fails because the restraints at issue impact multi-billion dollar markets.

Harley also tries to attack the market by speculating that there could conceivably be "a part, for example, that only H-D offers" which it claims would mean that "there can be no anticompetitive tie as to that part because the tie would not foreclose any competition for that part." Br. at 30.  In addition to being a premature factual inquiry, this is an attempt to splinter the Compatible Parts market into potentially hundreds or thousands of smaller individual markets for each and every part that could be used on a Harley bike.  That is facially absurd. In any case, that Harley may be the only seller of a certain part is a question too premature to be posited, and it has no relevance to this question as only the parts made by the competitors are at issue when determining the volume of commerce.  Harley's warranty bars riders from *any* parts made by a competitor, regardless of whether Harley does or does not offer that part.  Plaintiffs have sufficiently pleaded a "multitude" of competitors in the parts market, as Harley itself concedes; this alone shows a substantial amount of commerce sufficient to satisfy the requirement.  If there

33

is competition there is commerce, and with Plaintiffs' market definitions intact, Harley's argument is obviously wrong.

### 3. Anticompetitive Effects

The anticompetitive effects of the tie that have been pleaded include the artificially driven up costs of the parts market as a whole, particularly Harley's own parts. As stated in the CAC, Plaintiffs have demonstrated that Harley's revenue for parts is likely "almost 23 times the size of its nearest competitor." CAC ¶ 95. Through its illegal tie, Harley captured a large percentage of the potential parts customer base and could set prices accordingly, thereby driving up prices in the parts market as a whole. *See e.g.* CAC ¶ 100.

### D. Plaintiffs Have Adequately Alleged Market Power in the Tying Product Market

Harley attempts to create new law in which a tying claim requires monopoly power in both the tying *and* tied markets, and their brief focuses on trying to rebut a claim Plaintiffs did not bring - for monopolization of the tied product market. The Court should readily reject that straw-man argument. Plaintiffs' allegations readily satisfy the black-letter law, which holds that in a tying arrangement, buyers are forced to buy the tied product, meaning that the seller is only required to have market power in the *tying* product market - here, the bikes. *Viamedia, Inc. v.*, 951 F.3d at 466 (the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms" (quoting *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984))).

Harley has already lost a motion to dismiss where it tried to argue that both the tied and tying markets required market power. *See Packaging Supplies, Inc.*, 2009 WL 855798, at *5 (plaintiff prevailed on the argument that it "need only present allegations that the tying seller has

34

sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product."). Harley repeats that failed argument here. If the seller already had monopoly power in the tied product market, then there would be no need to tie the products together. Thus, it is absurd to suggest that in order to allege a viable tying claim one must also allege market share or barriers to entry in the *tied* market - here, the parts market. Indeed, the tying claim exists because of competition in the tied market. *See*, *e.g.*, *Reifert,* 450 F.3d at 318 (7th Cir. 2006) ("[w]here there is no competition in the tied market, there can be no antitrust violation.").

Instead, Plaintiffs allege that Harley used its already substantial monopoly power in the *tying* bike market to attempt to foreclose competition in the parts market by forcing its new customers into purchasing only Harley-branded parts in the *tied* market. CAC ¶ 98. By gobbling up this substantial corner of the tied parts market, Harley commands an improper premium on its parts.

Harley's "own conduct" that is the subject of this litigation (and the FTC's Consent Order) helped to create a very real barrier in the parts market, since it limited the available market share through its monopolization of the bike market and forcing of new bike buyers to effectively be locked into using only Harley's parts for the period of their warranties. As Plaintiffs explain,

> Harley-Davidson's conditioning of its warranty on the use of Harley-Davidson parts provided a powerful disincentive to dealers stocking and riders choosing competing Compatible Parts. A new entrant would have to contend with an already robust market in Compatible Parts for those Harley owners who were not covered by manufacturer warranties or intended to void them; and the new entrant would have no more access to the Class Members, those owners still under warranty, then any of the existing competitors in the Compatible Parts market.

CAC ¶ 92. This satisfies Plaintiffs' pleading burden. Harley instead is making speculative use-case arguments that can only be assessed after discovery.

35

Plaintiffs have pleaded Harley's attempt through tying to monopolize the parts market. It is axiomatic that a plaintiff does not need to plead that a defendant has completed an attempt at monopolization action in order to allege the attempt. Plaintiffs have adequately pleaded a monopoly in the foremarket of the bikes, which Harley then used through its illegal warranty practices in order to tie in the aftermarket of replacement parts.

Harley argues that because certain symptoms of monopolization may not be present in that aftermarket (a factual inquiry that is prematurely raised here in the motion to dismiss), and that the entire claim therefore fails - notwithstanding the fact that Plaintiffs have not and need not allege that the tied market is a monopoly, but rather that Harley is attempting through the tie to monopolize, which is an acceptable claim of a tie constituting monopolization. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 447-48 (1993) (courts "have generally required a plaintiff in an attempted monopolization case to prove that (1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. Unfair or predatory conduct may be sufficient to prove the necessary intent to monopolize."). *See also Deere*, slip op. at 86-89, holding that the derivative aftermarket tie alleged, based on Deere's dominance in the tying equipment market and its actions to tie the repair services market, also states a claim under Section 2 of the Sherman Act.

Harley does have, by contrast, monopoly power in the *tying* market. Monopoly power is defined as "a seller's ability to charge a price above the competitive level (roughly speaking, above cost, including the cost of capital) without losing so many sales to existing competitors or new entrants as to make the price increase unprofitable." *Sheridan,* 530 F.3d at 594. The lack of an exact market share is also not fatal here; the Seventh Circuit has long recognized "market share is not the exclusive approach to assessing the presence or absence of monopoly power. Inferential

proof of market share may be a proxy for direct evidence that the defendant possessed monopoly power in the sense of the power to 'control prices or exclude competition.'" *State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.,* 730 F. Supp. 826, 904 (C.D. Ill. 1990), quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,* 708 F.2d 1081, 1106 (7th Cir. 1983). *See also Grinnell Corp.,* 384 U.S. at 571 ("[t]he existence of [monopoly] power ordinarily may be inferred from the predominant share of the market"); see *also MCI Communications Corp. v. Amer. Tel. & Tel. Co.,* 708 F.2d 1081, 1107 (7th Cir. 1983) ("Where that data reveals a market share of more than seventy to eighty percent, the courts have inferred the existence of monopoly power").

To be sure, Plaintiffs have alleged sufficient barriers with regard to the motorcycle foremarket, whose monopoly Harley used in order to unlawfully tie purchases of parts. CAC ¶¶ 88-91. Ignoring the relevant market definition, and the requirement of a distinctively American brand to enter into it, Harley proposes hypothetically that the Big 4 Japanese makers could simply choose to increase their market shares in the United States, and that there are no alleged barriers to entry that would preclude them from doing so. Br. at 6. But this ignores Plaintiffs' particularized allegations regarding the market. CAC ¶¶ 39-50. Harley has no fact-based argument here unless it can succeed in dismantling the definition of the relevant markets, and it is unable to do so.

Defendants have offered no cases to suggest that *both* the foremarket and the aftermarket require monopolies, which is what they appear to really be saying here – given that their citations in favor of their argument regarding barriers to entry is that barriers to entry are needed to establish monopoly power. Br. at 34-35. But there is no basis in law for this standard. In any case, as Plaintiffs plead, Harley's forcing of its new bike customers to only use Harley parts means that the already dominated smaller parts manufacturers have to compete even more for consumers when they outgrow the warranty period and can finally escape Harley's grasp. CAC ¶ 92.

37

### E. Plaintiffs Sufficiently Plead Antitrust Injury and Damages

Relying almost entirely on cases from outside of this Circuit, Harley argues that Plaintiffs must (and do not) allege that the illegal tie increased the combined price for the motorcycle and parts, as is required to claim damages. *See* Br. at 41. This challenge is misplaced, both legally and factually, and imposes a burden on Plaintiffs that has not been required by the Seventh Circuit. In fact, the motorcycles – the motorcycle and warranty package - were overpriced because the warranty offered less than the law required, CAC ¶¶ 117, 118, 121; and the parts were overpriced because Harley used its illegal tie to diminish parts competition, CAC ¶¶ 98, 124, 134. So this factual standard is satisfied, even though it is not a requirement of these claims.

In a tying case, "the measure of damages . . . is the amount of the overcharge, or difference between the price paid for the tied product and its fair market value." *Johnson v. Nationwide Indus., Inc.*, No. 77 C 1162, 1985 WL 2003, at *1, *3 (N.D. Ill. July 1, 1985) (denying defendants' motion for summary judgment and finding plaintiffs' evidence "sufficient to create a triable issue on damages, at least in the absence of more compelling evidence from defendants that their management fees were fully consonant with what was charged elsewhere in the Chicago market"), *on reconsideration*, No. 77 C 1162, 1986 WL 7072 (N.D. Ill. June 16, 1986) ("[T]he measure of damages in a tying case is the difference between the price paid for the tied product and its fair market value[.]"). *See also Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1054 (5th Cir. 1982), cert. denied,* 459 U.S. 1105 (1983) ("In a tying arrangement, 'the ordinary measure of damages would be the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market[.]'" (internal citation omitted)).

It is not surprising that Harley resorts to out of Circuit case law to support its position here and ignores a relevant case from this Circuit in which the court found similar allegations of tying

38

sufficient to deny Harley's motion to dismiss. *See Packaging Supplies, Inc.*, 2009 WL 855798, at *6 ("[T]he restraint on free competition in the market for the tied product that PSI alleges (the *Reifert* formulation of the required tied-market effect) is that buyers of plastic merchandise bags are forced to pay above-market prices (the *Carl Sandburg* formulation of the required tied-market effect)."). In *Packaging Supplies, Inc.*, the plaintiff alleged that Harley instructed dealers to purchase merchandise bags only from Harley itself when many Harley dealers would have preferred to purchase bags from the plaintiff, feared repercussions if they did, and were therefore forced to pay above-market prices for the bags. *Id.* at *4-5. The court found such allegations sufficient at the pleading stage. *Id.* at *6.

Accordingly, Plaintiffs' allegations here - that Harley's illegal tying arrangement caused them to pay above-market prices for parts (the tied product) - are sufficient at the motion to dismiss stage. The only Seventh Circuit case cited by Harley is inapposite. *See Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 673 (7th Cir. 1985). In *Will*, a post-trial case, several franchisees sued their franchisor, claiming that the franchisor broke its contract and violated Section 1 of the Sherman Act by "tying" data processing to the franchise. *Id.*, 776 F.2d at 669. Following a jury trial, the district court entered judgement for the defendants on the antitrust theory. *Id.* at 671. The franchisees challenged the verdicts, *inter alia*. *Id.* Ultimately, the Seventh Circuit found that plaintiffs failed to establish that the franchisor had market power as a matter of law, which made "every other element of the anti-trust case irrelevant." *Id.* The present case does not involve allegations of a franchisor-franchisee situation, and Plaintiffs have alleged that Harley maintained market power in both relevant markets. *See* Br. at 21, *supra;* CAC ¶¶ 88-96. Moreover, Plaintiffs have also alleged that consumers prefer to avoid Harley's own service and retail channels, when they are not restricted from doing so by Harley's illegal warranty tie. *See e.g.,* CAC ¶¶ 58-63, 71.

39

*See Will*, 776 F.2d at 669 ("A tie within the meaning of antitrust depends on showing that the buyer did *not* want to take both products from the same vendor." (emphasis in original)).

The other cases cited by Harley are equally unavailing. *Lakeland Reg'l Med. Ctr., Inc. v. Astellus US, LLC*, 763 F.3d 1280 (11th Cir. 2014) was a class certification decision, largely decided on standing, where the court did not "express any opinion regarding the claim's merits." *Id.* at 1285 n.4. *Kypta v. McDonald's Corp.*, 671 F.2d 1282 (11th Cir. 1982), was an appeal of the trial court's decision dismissing and refusing to certify the plaintiff's real estate tie-in claim as a class action. *Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*, Civil Action No. 07-5295, 2008 WL 3833577, *2 (D.N.J. Aug. 13, 2008), held merely that volume discount arrangements do not constitute tying.

Here, Plaintiffs allege that Harley maintains market power in both the tied and tying markets and used its market power in the market for motorcycles to coerce customers not to purchase Compatible Parts from its competitors. *See, e.g.,* CAC ¶¶ 88-97. Plaintiffs also allege that they paid above-market prices for parts and servicing due to the illegal tying arrangement. *See, e.g.,* CAC ¶¶ 98, 124, 134. This is all that is required at the pleading stage.[13] *See, e.g., Maryland Staffing Services, Inc. v. Manpower, Inc.,* 936 F. Supp. 1494, 1503 (E.D. Wi. 1996) (complaint adequately alleged illegal tying arrangement at the motion to dismiss stage until the evidentiary record was more fully developed); *Packaging Supplies, Inc.* , at *5 ("[W]hile a plaintiff at the pleading stage must allege plausible facts, it need not marshal all of its evidence.").

---

[13] Plaintiffs have also alleged that because of Harley's anticompetitive conduct, it is difficult - if not, impossible - to obtain the total package cost at the time of purchase. *See, e.g.,* CAC ¶¶ 75, 84. At the pleading stage, before fact and expert discovery have been conducted, these allegations are sufficient.

## F. **Plaintiffs Appropriately Bring Claims under the Wisconsin Antitrust Act**

The Seventh Circuit has rejected the use of premature choice-of-law challenges like the one advanced by Defendants at the pleading stage. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 538 (7th Cir. 2011) (denying Defendants' choice-of-law based motion to dismiss); *Williams v. State Farm Mut. Auto. Ins. Co.*, No. 22 C 1422, 2023 WL 4106067, at *22 (N.D. Ill. June 21, 2023) ("The *Morrison* Court went on to reason that the choice-of-law question—whether Illinois law applied to out-of-state plaintiffs - did not lend itself to resolution under Rule 12(b)(6)."). Instead, courts in this Circuit recognize that choice-of-law issues "are best resolved at the class-certification stage."[14] *Id.* at *22; *Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 412–13 (N.D. Ill. 2021) (Rule 12 motion denied because "the parties have not had an opportunity to develop the legal and factual record needed to resolve the important choice-of-law questions"). The present motion does not address class certification and discovery has not started.[15] Therefore, Defendants' choice-of-law challenge is premature and should be rejected.

---

[14] Courts have certified multi-state classes under the forum state's law where most of the relevant conduct occurred in that state, as Plaintiffs allege occurred here. *See, e.g.*, *In re Packaged Seafood Antitrust Litig.*, 332 F.R.D. 308, 346 (S.D. Cal. 2019).

[15] Contrary to Defendant's argument, choice-of-law is not determined solely by the state of purchase. Instead, states have varying choice-of-law rules that consider a multitude of factors. *See Texas Hill Country Landscaping*, 522 F. Supp. 3d at 411 (the most significant relationship looks to factors such as: "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered."); *Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 114–15 (D. Mass. 2001) (The Massachusetts Supreme Judicial Court "has refused to bind itself to a single choice of law doctrine" and courts may consider: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."); *Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531, 534–36 (D. Minn. 2007) (Minnesota courts determine if there is "significant contact or aggregation of contacts" and then "consider five choice-influencing factors: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law."); *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 54-78 (E.D.N.Y. 2000) (Declining to apply the "last event

41

Defendants, nonetheless, claim that Count 1 should be dismissed because no named plaintiff alleged they live in Wisconsin or made a purchase in Wisconsin. (Br. at 42-44). When dealing with challenges to claims brought under the laws of states in which no named plaintiff has purchased goods, "the trend has been to treat the issue as one of statutory standing that can be deferred until class certification." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 548 (N.D. Ill. 2019); *see also*, *Morrison,* 649 F.3d at 536 ("There's no problem with standing. Plaintiffs have standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision."); *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008)("the inherent problem with the idea of 'standing to bring a class action' is that it 'conflat[es] the standing inquiry with the inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative[.]'"); *Freeman v. MAM US Corp.*, 528 F. Supp. 3d 849,    859 (N.D. Ill. 2021) (denying Defendant's standing challenge noting that, standing "is a question to be answered after discovery on the propriety of class certification - not right out of the box."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 809-10 (N.D. Ill. 2017) ("Plaintiffs plausibly allege an injury in fact by alleging that they paid inflated prices. . .  For the time being—meaning at the pleading stage and prior to analysis of the class allegations under Rule 23 - this analysis suffices to establish the named plaintiffs' standing to assert the claims of class members in other states."); *Texas Hill Country Landscaping*, 522 F. Supp. 3d at 408 ("[T]his court agrees with district courts in the

---

necessary test" and applying New York law after conducting an "interest analysis" when the place of illegal conduct (N.Y.) differed from the place of resulting injury (plaintiffs domiciled throughout the nation)); *Oregon Potato Co. v. Kerry Inc.*, 575 F. Supp. 3d 1064, 1083–84 (W.D. Wis. 2021) (Noting that while the location of the injury was Washington, the location of the wrongful conduct (misrepresentations and omissions) was Wisconsin, "so that factor points to applying Wisconsin law.")  Here, discovery is necessary before a proper choice-of-law analysis can be conducted as the full scope and location of Defendants' conduct is not known at this time.

Seventh Circuit that have concluded that '[w]hether the named plaintiffs 'may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.'").  A decision on Plaintiffs' ability to bring representative claims under Wisconsin law[16], like choice-of-law, is premature.  Defendants' motion should be denied.

## III.  PLAINTIFFS' CLAIMS THAT "SOUND IN FRAUD"

Fed. R. Civ. P. 9(b) requires a party pleading fraud to "state with particularity the circumstances constituting fraud."  While the "level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading 'ordinarily requires describing the who, what, when, where, and how of the fraud.'" *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F. 3d 732, 737 (7th Cir. 2014) (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)). Certain components, such as "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  As detailed below, as to the statutory claims that "sound in fraud," Plaintiffs have satisfied the elements of who, what, where, when, and how.

"Who" is Harley itself, which made the misrepresentations and omissions at issue when the Limited Warranty was sold as a bundle with its motorcycles.  *See* CAC ¶¶ 30-31, 178-81.  This is enough.  *See Fon Du Lac Bumper Exchange, Inc. V. Jui Li Enterprise Co. Ltd.*, 85 F. Supp. 2d

---

[16] Even if this Court were to consider the merits of this premature argument, the Wisconsin Supreme Court has concluded that the Wisconsin Antitrust Act is not restricted to Wisconsin residents. *Olstad v. Microsoft Corp.*, 284 Wis. 2d 224, 235, 700 N.W.2d 139, 144 (2005) ("On its face, the statute refers to 'every contract,' 'any contract,' and *'every person' without restricting its purview to Wisconsin contracts or persons in Wisconsin*.") (emphasis added); Wis. Stat. § 133.18 (allows "any person" injured to bring suit); *Meyers v. Bayer AG, Bayer Corp.*, 2007 WI 99, ¶ 3, 303 Wis. 2d 295, 300, 735 N.W.2d 448, 451 (2007) (affirming that Wisconsin's Antitrust Act reaches interstate activities and is not limited to intrastate activity).

43

1007, 1012 (E.D. Wis. 2015) ("who" prong adequately alleged by naming defendants).[17]   The Court should reject Harley's attempt to litigate speculative facts outside the CAC, such as its hypothetical that the misrepresentations could have been made by "personnel affiliated with the sellers of parts" or "a "dealer."  Br. at 47.  Even if those factual contentions were appropriately considered at this stage, they are nothing more than Harley grasping at straws.

"What" are the misrepresentations and omissions concerning the terms of the Limited Warranty, and Harley's statements that using non-Harley parts can void the warranty.  "Where" is the Limited Warranty, as well as Harley's omissions.  *See* CAC ¶ 31, ¶ 114, ¶ 115, ¶¶ 178-81. Such statements satisfy Rule 9(b).  *Compare Palmer v. Procter & Gamble Co.,* 2023 WL 5852252, at *4 (N.D. Ill. Sept. 11, 2023) (alleged misstatements on box of tampons asserting they "are made entirely of cotton; are pure; lack added coloring; and are environmentally friendly" describe the "who", "what", and "how" with particularity); *Womick v. Kroger Co*., 2022 WL 673095, at *4 (S.D. Ill. Mar. 7, 2022) (case about quantity of coffee pled "the 'what': the number of cups the canisters represent they can make . . . the 'where': on the label of the canisters"); *Fon Du Lac Bumper Exchange*, 85 F. Supp. 2d at 1012 ("what" element adequately alleged through allegations "falsely attributing the cause of price increases to other causes and agreeing among themselves to keep their price-fixing secret").

Harley's argument that Plaintiffs alleged that Harley "both disclosed and failed to disclose the alleged restrictions" (*see* Br. at 47), misinterprets Plaintiffs' claims. Plaintiffs' claims of fraud

---

[17] *Van Den Heuvel v. AI Credit Corp*., 951 F. Supp. 2d 1064, 1079 (E.D. Wis. 2013) is distinguishable.  In that case, concerning a non-class fraud action against life insurance premium financing firms and insurers for alleged misrepresentations regarding a life insurance policy, the court dismissed the claims because it was unclear which entities were involved in the making of the alleged misrepresentations.  Here, by contrast, it is undisputed that Harley-Davidson made the misrepresentations and omissions in the Limited Warranty.

44

include both affirmative representations and omissions/fraudulent concealment. For example, Count 4 covers affirmative misrepresentations in the Limited Warranty itself, *see* CAC ¶¶ 166-76, and Count 5 covers fraudulent concealment and omissions of these restrictive warranty terms until after the point of sale. *See id.* at ¶¶ 178-88.

Moreover, Defendants' cases are inapposite. In *Cota v. Ralph Lauren Corp.*, 603 F. Supp. 3d 666, 675 (E.D. Wis. 2022), the court dismissed a class action against a clothing manufacturer for misrepresenting the type of cotton it used, holding that that the plaintiff "does not identify the product she purchased or the products that were supposedly tested, does not describe what representation RLC made with respect to the products, i.e., what percentage of pima cotton was incorporated into the product, and does not describe to what extent the actual pima cotton content in the product conflicted with the amount represented." In *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1001-02 (N.D. Cal. Jul. 28, 2009), a case involving alleged misstatements regarding subscriptions to antivirus software, plaintiff failed to "describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." In *Brumfield v. Merck & Co., Inc.*, 2018 WL 2277835, at *8 (E.D.N.Y. May 18, 2018), a mass action involving alleged misrepresentations in advertisement concerning a vaccine, the court held that plaintiffs did "not identify any specific advertisements; the precise information misrepresented in or omitted from the advertisements; or when and where the advertisements were printed or aired." Here, by contrast, each plaintiff purchased a Harley-Davidson motorcycle, and was thus provided with, and ostensibly subject to, the Limited Warranty containing the misleading terms.

45

Plaintiffs have sufficiently alleged with particularity "when" the fraudulent statements were made. The Limited Warranty is provided to Plaintiffs when the vehicle is sold, but the terms are "see the dealer," with no clarity until some unspecified time. Defendants' rhetorical questions about where Plaintiffs received these misrepresentations, Br. at 46-47, are unavailing. Again, as described above, this conflates the affirmative representations and omissions. Plaintiffs have specifically pled that, while Defendants "fail to require their dealers to disclose the written warranty terms to Plaintiff and Class Members prior to the point of sale" CAC ¶ 104, Plaintiffs are provided with the Limited Warranty at the point of sale.[18] *Id.* at ¶¶ 180-81. Thus, for purposes of pleading, Plaintiffs' allegations satisfy the "when" element.

Plaintiffs have alleged with particularity "how" the statements at issue were fraudulent. As set forth in the CAC, "Harley-Davidson *knowingly and intentionally indicated to Plaintiffs that they would be unable to use parts not authorized by Defendants* on the products that they had just purchased, and thus were barred from repairing their motorcycles using non-Harley-Davidson brand parts that may be cheaper or more effective than authorized Harley-Davidson brand parts." *Id.* at ¶ 166 (emphasis added). Similarly, "Defendants indicated to Plaintiffs and members of the Class that they would be unable repair the motorcycles that they purchased *unless they used authorized service providers*." *Id.* at ¶ 167. (emphasis added). The CAC states that such statements constituted misrepresentations because "Defendants misrepresented that these unlawful

---

[18] *PB Property Mgmt. Inc. v. Goodman Manufacturing Co.* L.P., 2013 WL 12172912, at *7 (M.D. Fla. Aug. 28, 2013), cited by Defendants, is distinguishable. In that case, the court dismissed fraud-related claims concerning defective air conditioning units and statements made about their quality, finding "[t]he Complaint does not, for example, state when Plaintiff viewed the alleged misrepresentations on Defendants' website, or even whether it - or any other consumer - viewed them at all before purchasing the allegedly defective products." Here, by contrast, the statements at issue were provided to every purchaser at the point of sale.

repair restrictions were binding and enforceable *even though such restrictions were explicitly unlawful according to FTC regulations and thus unenforceable*." *Id.* at ¶ 168 (emphasis added). While Rule 9(b) provides that intent and knowledge may be pled generally, Plaintiffs have nonetheless alleged that "Defendants were on *actual and constructive notice* that their warranties were unlawful because federal and state law explicitly forbade these actions." *Id.* at ¶ 169 (emphasis added). Such allegations plead with particularity "how" the Limited Warranty was fraudulent, and how Harley knew or should have known that the terms therein were unlawful and unenforceable.

Plaintiffs' allegations satisfy Rule 9(b). *Compare Palmer,* 2023 WL 5852252, at *4 (alleged misstatements on box of tampons asserting they "are made entirely of cotton; are pure; lack added coloring; and are environmentally friendly" describe the "who", "what", and "how" with particularity); *Womick*, 2022 WL 673095, at *4 (case about quantity of coffee pled "the 'what': the number of cups the canisters represent they can make . . . the 'where': on the label of the canisters"); *Fon Du Lac Bumper Exchange*, 85 F. Supp. 2d at 1012 ("what" element adequately alleged through allegations "falsely attributing the cause of price increases to other causes and agreeing among themselves to keep their price-fixing secret").

## IV.     PLAINTIFFS' OTHER STATUTORY CLAIMS

### A.     Michigan and Oklahoma Consumer Protection Statutes Do Not Exempt Harley's Conduct

Defendants erroneously contend that claims arising from motorcycle warranties or "*automobile purchases*" are exempt from the scope of the Michigan Consumer Protection Act ("MCPA") and Oklahoma Consumer Protection Act ("OCPA") (CAC Counts 42 and 67), merely due to the availability of Magnuson-Moss Warranty Act ("MMWA") claims. BR. at 49-51. Defendants' argument is premature as to the MCPA. Michigan courts recognize that an exemption

47

to the MCPA is properly raised as "an affirmative defense" and is therefore inappropriate to address at this stage of the litigation. *See Golden Star Wholesale, Inc. v. ZB Importing, Inc.*, 531 F. Supp. 3d 1231, 1253–54 (E.D. Mich. 2021) (declining to dismiss MCPA claims).

Additionally, the MMWA and the MCPA may be applied simultaneously – even in the automotive context - without triggering the exemption. *See Chiulli v. Am. Honda Motor Co.*, 2023 WL 5763053, at *6 (N.D. Cal. Sept. 6, 2023) (denying motion to dismiss both MMWA and MCPA claims); *see also In Re Porsche Cars North America, Inc.*, 880 F. Supp. 2d 801, 856 (S.D. Ohio July 19, 2012) (sustaining both MCPA and MMWA claims).

Likewise, the Oklahoma statute does not automatically exempt commerce involving motor vehicles merely because some agency regulates aspects of those businesses. *In re Gen. Motors Corp.*, 2005 WL 1924335, at *3 (W.D. Okla. Aug. 8, 2005) (allowing defect and breach of warranty claims). The OCPA exemption "does not apply when a defendant's conduct is governed in some respects by a state or federal agency, but the specific conduct at issue is not within the scope of the agency's authority." *Sisemore v. Dolgencorp, LLC,* 212 F. Supp. 3d 1106, 1109 (N.D. Okla. 2016). Here, Harley fails to identify the specific conduct that falls within the exemptions in either the MCPA or the OCPA and thus have not met their burden.

**B.** **The Illinois Plaintiffs Received Fraudulent Communications from Harley Davidson**

Harley incorrectly asserts (Br. at 52) that Illinois Plaintiffs received no specific deceptive communication or advertisement. Each Plaintiff, including Assise, Lipkin, and Demkiv, received a motorcycle owner's manual, a communication from Harley Davidson. CAC ¶¶ 113, 124. This communication *omitted material facts* and Illinois law clearly recognizes that "an omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 504 (1996). Harley's Limited Warranty contained

48

within the owners' manual omits a material term - "the requirement to use Harley Davidson specified dealers, parts, and accessories." CAC ¶ 104. Allegations that point-of-sale communications omit material terms satisfy the pleading requirements under Illinois state law. *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 969 (N.D. Cal. 2018) (inferring an omission under Illinois law where dealerships failed to disclose a defect at the point of sale).

### C. Plaintiffs' Alleged Failure to Provided CLRA Notice Is Not a Basis for Dismissal

The Court should reject Harley's argument that Plaintiffs' damages claim under the CLRA should be dismissed based on Plaintiffs' supposed failure to comply with the CLRA's procedural requirement to give a defendant notice and an opportunity to cure before seeking damages in court.

First, the CLRA's notice requirement is a state law procedural requirement that does not apply in federal court, and the Court's inquiry need go no further. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (federal courts sitting in diversity apply state substantive law but federal procedural law. The Court's inquiry need go no further.

Second, even if this provision applied in federal court, the CLRA requires 30 days' written notice and an opportunity to cure before *damages*- not injunctive relief - may be sought in court. *See* Cal. Civ. Code § 1782(a)(1), (b) (expressly applying only to an action "for damages"), (d) (providing action for injunctive relief may be brought without giving notice, and after 30 days, "the consumer may amend his or her complaint without leave of court to include a request for damages"). Plaintiffs gave Harley notice and an opportunity to cure. *See* Compl. ¶¶ 108-09, ECF No. 1, *Koller v. Harley-Davidson Motor Co.*, No. 4:22-cv-04534 (N.D. Cal. Aug. 5, 2022) (providing CLRA notice to Harley and advising Plaintiff would amend to seek damages if Harley did not rectify its wrongful conduct).

49

Finally, Harley's argument ignores California case law in an attempt to enforce a more stringent standard that would serve no benefit other than to waste the Court's and the parties' time. Although *some* federal courts agree that strict adherence to the CLRA 30-day notice provision is required,[19] the California Court of Appeals "has expressly disapproved of this approach" going as far as "rebuking courts which have taken it for 'fail[ing] to properly take into account the purpose of the notice requirement' - which is to allow a defendant to avoid liability for damages ***if it expeditiously corrects the alleged wrongs***[.]" *Norman v. FCA US, LLC*, 2023 WL 6388926, at * 18 (E.D. Mich. Sept. 30, 2023) (quoting *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1261 (Cal. Ct. App. 2009) (emphasis added). Here, Harley was put on notice of the CLRA claims in August 2022 with the filing of the *Koller* Complaint, and Koller sought only injunctive relief in that initial complaint while providing Harley notice of his intention to amend to seek damages. *See* CAC ¶ 282. More than a year later, Harley has *still* not taken any steps to rectify the past harm of its practices. *See Clark v. InComm Fin. Servs., Inc.*, 2023 WL 5167364, at* 5 (C.D. Cal. Jul. 17, 2023) ("Defendant cannot now contend that Plaintiffs failed to provide an opportunity to cure the alleged defects when Defendant made no use of a potential opportunity to do so."). Even if the Court agreed with Harley, Plaintiffs would simply file an amended complaint[20] thirty days after issuing "formal" notice - an unnecessary waste of resources. *See Baird v. Samsung Electrs. Am., Inc.*, 2018 WL 4191542, at *9 (N.D. Cal. Jul. 20, 2018), *rev'd and*

---

[19] Harley cites *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) (Br. at 52-53) for this proposition; however, the CLRA claims in that case were dismissed for lack of standing before the Court even reached the issue of notice. Harley also cites *Shu v. Toyota Motor Sales USA, Inc.*, 2023 WL 3028071 (N.D. Cal. Apr. 19, 2023), but, in that case, plaintiff attempted to use the operative complaint for injunctive relief - not a complaint filed more than a year prior – as the basis for notice.

[20] *See Benipayo v. Volkswagen Grp. of Am., Inc.*, 2020 WL 553884, at *7 (N.D. Cal. Feb. 4, 2020) (stating "the typical remedy for inadequate notice" is "dismissal with leave to amend after proper notice is sent").

*remanded on other grounds*, 804 F. App'x 481 (9th Cir. 2020) ("there is nothing to gain by dismissing … the claim should be allowed to proceed if otherwise proper.").

### D. Plaintiffs' California UCL (and Other Equitable Relief Claims) Are Cognizable

Harley argues that Plaintiffs' UCL claim (CAC Count 11), "and other requests for equitable relief"[21] should be dismissed for failing to allege an inadequate remedy at law. *See* BR. at 53. Plaintiffs may plead legal remedies in one section of their complaint without foreclosing the ability to plead equitable remedies in another. *See Feeco Intern., Inc., v. Oxane Materials, LLC*, 2013 WL 5273930, at *1 (E.D. Wisc. Sept. 18, 2013) ("Plaintiff is correct that federal pleading standards allow for pleading in the alternative, which permits a party to make claims that may not be facially consistent.").[22] In addition, Harley's arguments presume that Plaintiffs are entitled to a legal remedy for their other claims, which is a determination not made at this stage. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).

### E. Defendant's Meritless Undeveloped Argument on Plaintiffs' Claims

Harley makes an undeveloped[23] three-sentence catchall argument in stating that "[s]everal" of Plaintiffs state law claims fail because they are predicated on other "doom[e]d" claims. *See* Br.

---

[21] Harley fails to fully explain its arguments forcing Plaintiffs (and the Court) to speculate as to which "equitable" claims it wants dismissed. Making a fledgling argument such as this is a basis to deny Harley's motion, certainly as to any claims it has not specified in its request for dismissal. *See infra*. n.8.

[22] Harley cites *Williams v. Apple, Inc.*, which dealt with injunctive claims under the FAL and UCL that were deemed duplicative of an existing claim for breach of contract which sought monetary damages. 2020 WL 6743911, at *9-10 (N.D. Cal. Nov. 17, 2020). Importantly, in contrast to this case, plaintiffs in that case did not argue that the conduct was ongoing, or that injunctive relief was required to forestall future harm.

[23] Harley's summary treatment of this argument is an independent basis to deny its motion. *See Reiff v. Bd. of Regents of the Univ. of Wisc. Sys.*, 2014 WL 4546041, at *4 (W.D. Wisc. Sept. 12, 2014) (inadequately developed arguments in an opening brief may be forfeited) (citing *Hernandez*

at 53-54. But Harley cherry picks single paragraphs from certain counts which reference violations of other statutes without acknowledging that each of these state law claims contains sufficient factual allegations of wrongdoing which are independent of their reliance on other statutes.[24] Accordingly, such argument should be summarily disposed.

## V. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS

Harley raises four, one-sentence arguments as to why it believes the Court should dismiss the plaintiffs' unjust enrichment claims. Each one fails.

### A. Harley's Bare Assertion that Unjust Enrichment Falls with Other Claims Is Incorrect

Unsupported by any authority, Harley argues that Plaintiffs' unjust enrichment claims fail "for the same reasons as the other claims." An unjust enrichment claim has distinct elements: "(1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." *Sands v. Menard*, 2017 WI 110 at ¶ 30, 379 Wis. 2d 1, 18-19, 904 N.W.2d 789, 798.[25]

---

*v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011)); *see also U.S. v. South*, 28 F.3d 619, 629 (7th Cir. 1994) (citing cases).

[24] For example, Harley claims Plaintiffs' UCL claims should be dismissed because of purported reliance on the Magnuson-Moss Warranty Act, The Song-Beverly Warranty Act, and the CLRA, but Harley fails to point out that Plaintiffs' claims under these statutes contain freestanding allegations of illegal conduct which withstand the motion to dismiss. *See e.g.,* CAC ¶¶117-24, 147-56 (MMWA claim).

[25] While there is some variation between the states' respective elements, there is little variation from the framework described in *Sands*. *See, e.g. Duty Free World v. Mia. Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018) ("To make an unjust enrichment claim under Florida law, Plaintiffs must allege that: (1) Plaintiffs conferred a benefit on Defendants; (2) Defendants voluntarily accepted and retained the benefit; and (3) that it would be inequitable for Defendants to retain the benefit."); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 137 Ill. Dec. 19 (Ill. 1989) (under Illinois law, "plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."); *Lass*

52

## B. Adequate Remedies at Law

Inexplicably, while simultaneously arguing Plaintiffs do not have *any* remedies, Harley claims that Plaintiffs may not bring unjust enrichment claims because they have adequate remedies at law. Under Federal Rule of Civil Procedure 8(d), "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count or . . . in separate ones" and "may state as many separate claims . . . as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2), (3); *Aurora Health Care Inc. v. Blue Cross Blue Shield*, No. 22-cv-1159-bhl, 2023 U.S. Dist. LEXIS 166122, *15 (E.D. Wis. Sep. 19, 2023) (*quoting* Fed. R. Civ. P. 8(a)(3)).

Here, Plaintiffs bring their unjust enrichment in the alternative to the other claims alleged. This is "entirely proper." *N. Grp., Inc. v. Tech 4 Kids Inc.*, 352 F. Supp. 3d 882, 888 (E.D. Wis. 2018); *see also, e.g., Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1118 (E.D. Wis. 2016) (applying Ninth Circuit law to allow even a "superfluous" unjust enrichment claim to proceed past the motion to dismiss stage). The Seventh Circuit has specifically held that "while [c]laims for breach of contract and unjust enrichment are mutually exclusive[,]… a complaint may plead these two state-law theories in the alternative." *Blanchard & Assocs. v. Lupin Pharms., Inc.*, 900 F.3d 917, 921 (7th Cir. 2018).

---

*v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012) (Massachusetts); *Bellevue Ventures, Inc. v. Morang-Kelly Inv.*, 302 Mich. App. 59, 64, 836 N.W.2d 898, 901 (2013) (Michigan); *Bank of Montreal v. Avalon Capital Grp., Inc.*, 743 F. Supp. 2d 1021, 1032 (D. Minn. 2010) (Minnesota); *Kennedy v. Carriage Cemetery Servs.*, 727 F. Supp. 2d 925, 932 (D. Nev. 2010) (Nevada); *Billsie v. Brooksbank*, 525 F. Supp. 2d 1290, 1298 (D.N.M. 2007) (New Mexico); *Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42, 50 (S.D.N.Y. 2016) (New York); *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters.*, 505 F. Supp. 3d 570, 586 (M.D.N.C. 2020) (North Carolina); *Wells v. Johnson & Johnson*, 554 F. Supp. 3d 1207, 1215 (W.D. Okla. 2021) (Oklahoma); *Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 555 (W.D. Wash. 2019).

Federal courts in each of the states in which a named plaintiff resides interpret Rule 8 in a similar fashion, permitting plaintiffs to plead legal and equitable theories in the alternative at the pleading stage. *See, e.g.*: *Cabrales v. Castle & Cooke Mortg., Ltd. Liab. Co.*, No. 1:14-cv-01138-MCE-JLT, 2015 U.S. Dist. LEXIS 76636 (E.D. Cal. June 10, 2015) (California); *Gibson v. Lynn Univ., Inc.*, 504 F. Supp. 3d 1335, 1344 (S.D. Fla. 2020) (Florida); *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 325 (7th Cir. 2021) (Illinois); *Malaro v. Wilkie*, Civil Action No. 22-10548-NMG, 2023 U.S. Dist. LEXIS 87863 *5-6 (D. Mass. May 19, 2023) (Massachusetts); *Net2Globe Int'l, Inc., v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 466 (S.D.N.Y. 2003) (New York).

### C.    California Construes Unjust Enrichment as a Request for Restitution

Harley's argument that California law does not recognize a standalone claim for unjust enrichment also fails.  The Ninth Circuit has specifically held that claims pled as unjust enrichment state a claim under California law as a "quasi-contract claim seeking the remedy of restitution." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015) (holding complaint alleging California unjust enrichment claim should be construed "as a quasi-contract claim seeking restitution," and upholding claim based on "straightforward statement" that defendant was unjustly enriched via sale of deceptively labeled product).

### D.    Plaintiffs Satisfy the Direct Benefit Element

Finally, Harley argues that various state laws require the Plaintiffs to plead that they conferred a direct benefit to Harley in order to plead unjust enrichment, and that Plaintiffs pled only that they conferred a direct benefit on Harley dealers.  Harley's argument fails because the jurisdictions at issue specifically consider a direct benefit to be conferred on an automotive manufacturer where a plaintiff purchases or leases his vehicle from a dealership affiliated with the automotive manufacturer. *See, e.g Nuwer v. FCA US Ltd. Liab. Co.*, 552 F. Supp. 3d 1344 (S.D.

54

Fla. 2021) ("[u]nder the laws of Arizona, Florida, and New York, 'a direct benefit is conferred on an automotive manufacturer where a plaintiff purchases or leases his vehicle from a dealership affiliated with the automotive manufacturer," citing *In re Takata Airbag Products Liab. Litig.*, 462 F. Supp. 3d 1304, 1326 (S.D. Fla. 2020)). Harley sells its new motorcycles only through authorized dealers. This, too, is the law in most or all jurisdictions to have examined it. *See Kiriacopoulos v. GM LLC*, No. 22-10785, 2023 U.S. Dist. LEXIS 60001 *40 (E.D. Mich. Apr. 5, 2023) (multiple states); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000) (finding direct benefit under Illinois, Minnesota, New York, and Wisconsin, and Michigan law outside the auto dealer context).

Accordingly, Harley's sales though its dealers confer a sufficiently direct benefit to invoke unjust enrichment, and Harley has offered no contrary authority.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss should be denied.

Respectfully submitted, December 14, 2023:

*s/ Thomas H. Burt*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Thomas H. Burt
Lillian R. Grinnell
270 Madison Ave
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
burt@whafh.com
grinnell@whafh.com

*Lead Counsel for the Proposed Class*

**ADEMI LLP**
Shpetim Ademi
Jesse Fruchter
John D. Blythin
3620 E Layton Ave
Cudahy, WI 53110
Tel: 414-482-8000
Fax: 414-482-8001
sademi@ademilaw.com
jfruchter@ademilaw.com
jblythin@ademilaw.com

*Lead Local Counsel for Plaintiffs and the Proposed Class*

55

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W Jackson Blvd - Ste 1700
Chicago, IL 60077
Tel: 312-984-0000
Fax: 212-686-0114
malmstrom@whafh.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes
Jeffrey L. Spector
2001 Market St - Ste 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
bcaldes@srkattorneys.com
jspector@srkattorneys.com

**GUTRIDE SAFIER LLP**
Seth A. Safier
Anthony J. Patek
Marie A. McCrary
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel: 415-639-9090
seth@gutridesafier.com
anthony@gutridesafier.com
marie@gutridesafier.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave S - Ste 2200
Minneapolis, MN 55401-2179
Heidi M. Silton
Jessica N. Servais
Joseph C. Bourne
Tel: 612-339-6900
Fax: 612-339-0981
hmsilton@locklaw.com
jcbourne@locklaw.com
jnswervais@locklaw.com

**REINHARDT WENDORF & BLANCHFIELD**
W1050 First National Bank Bldg
332 Minnesota St
St Paul, MN 55101
Garrett D. Blanchfield, Jr.
Brant D. Penney
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**MILBERG COLEMAN BRYSON**
Peggy J. Wedgworth
100 Garden City Pl – Ste 500
Garden City, NY 11530
Tel: 212-594-5300
pwedgworth@milberg.com

Michael A. Acciavatti
405 E 50th St
New York, NY 10022
Tel: 610-842-5801
macciavatti@milberg.com

Alex R. Straus
280 S Beverly Dr
Beverly Hills, CA 90212
Tel: 917-471-1894
Fax: 310-496-3176

Elizabeth A. McKenna
Arthur Stock
800 S Gay St - Ste 1100
Knoxville, TN 37929
Tel: 212-594-5300
Fax: 212-868-1229
emckenna@milberg.com

**TOSTRUD LAW GROUP, P.C**
Jon Tostrud
1925 Century Park E - Ste 2100
Los Angeles, CA 90067

**GLANCY PRONGAY AND MURRAY LLP**
Lee Albert
230 Park Ave - Ste 358

New York, NY 10169
Tel: 212-682-5340
Fax: 212-884-0988
lalbert@glancylaw.com

*Attorneys for Plaintiffs*